**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Marlan MITCHELL, Defendant–
Appellant.**

No. 03–5108.

United States Court of Appeals,
Sixth Circuit.

July 14, 2004.

Camille R. McMullen, Asst. U.S. Attorney, U.S. Attorney's Office, Memphis, TN, for Plaintiff–Appellee.

Robert C. Brooks, Memphis, TN, for Defendant–Appellant.

Before: KEITH and CLAY, Circuit Judges; and OBERDORFER, District Judge.*

KEITH, Circuit Judge.

Defendant–Appellant Marlan Mitchell ("Mitchell") appeals his jury conviction for distribution of cocaine base, in violation of 21 U.S.C. § 841(a), and possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g). For the reasons set forth below, we **AFFIRM** the conviction.

## I. PROCEDURAL BACKGROUND

On July 2, 2001, a Federal Grand Jury indicted Mitchell and charged him with three counts of unlawful possession of a controlled substance with intent to distribute, in violation of 21 U.S.C. § 841. On August 7, 2001, the same Federal Grand Jury superceded the July 2, 2001 indictment and added four additional counts of being a convicted felon in possession of a firearm and/or ammunition, in violation of 18 U.S.C. § 922(g).

On August 23, 2002, a jury convicted Mitchell on Counts Three, Four, Five, Six, and Seven (one drug offense and all weapons offenses). The jury was unable to reach a unanimous verdict on the remaining counts (the first two drug offenses). As a result, the district court declared a mistrial as to Counts One and Two. On

* The Honorable Louis F. Oberdorfer, United States District Court for the District of Columbia, sitting by designation.

December 27, 2002, the district court sentenced Mitchell to 288 months' imprisonment on Count Three, and 120 months' imprisonment on Counts Four through Seven, with the sentences to run concurrently. The district court also sentenced Mitchell to three years' supervision and a $100 special assessment. After sentencing, the district court dismissed Counts One and Two. This appeal followed.

## II. FACTUAL BACKGROUND

In May of 2001, Agent Dan Netemeyer ("Netemeyer") of the Federal Bureau of Investigations ("FBI") began monitoring phone calls from the Shelby County Jail that were placed to 1602 Hanauer, Apartment D. The person receiving the calls repeatedly identified himself as "10–4." Netemeyer determined that the conversations concerned illegal drug activity and began investigating the identity of "10–4." Netemeyer's preliminary investigation included checking who actually resided at 1602 Hanauer, Apartment D, verifying utility service, phone records, and the registration of the cars parked at the residence; all of which were in Mitchell's name. Another source informed Netemeyer that Mitchell was using 1602 Hanauer, Apartment B, the apartment next door, as a stash house for the drugs that he sold.

Netemeyer used a confidential informant, Derrick Taylor ("Taylor"), to approach Mitchell to confirm his preliminary investigation. Taylor testified that he did not know Mitchell prior to the contact, but that he knew someone who did, and that person introduced them. Before any contact, Netemeyer showed Taylor a photograph of Mitchell to ensure proper identification. Netemeyer and Taylor testified that contact was initiated and drug transactions occurred with Mitchell on three separate occasions, May 17, June 21, and June 29, 2001. Each transaction was conducted according to the following procedure: 1) the FBI agents searched Taylor prior to each drug exchange; 2) the FBI agents gave Taylor pre-marked and documented funds to give to Mitchell in exchange for drugs; 3) the FBI agents wired Taylor with a device so that the FBI agents could hear the transaction; 4) the FBI agents gave Taylor an emergency code word; and, 5) the FBI agents searched Taylor immediately after the drug exchange. The FBI agents paid Taylor between $500 and $1000 for each purchase he made from Mitchell.

On May 17, 2001, during the first transaction, a third party introduced Taylor to Mitchell. Taylor approached 1602 Hanauer, Apartment D, and a hand-to-hand exchange occurred through the side window in the backyard. Taylor purchased a quarter ounce of crack cocaine from Mitchell for $200. During the exchange, Taylor heard the screen door slam on the other side of the building. Taylor suspected that Mitchell had exited the apartment and had gone somewhere else to get the drugs. The FBI later tested the purchased drugs and confirmed that they were 3.5 grams of cocaine base. The FBI monitored the May 17, 2001 transaction by a recording device, and the prosecutor introduced the audiotape at trial. Netemeyer authenticated the transcript and the prosecutor provided it to the jury to assist them during the tape broadcast. At trial, the prosecutor stated that portions of the tape were unintelligible and requested the court to stop the tape. Defense counsel, however, objected and insisted that the tape be played in its entirety.

On June 21, 2001, Taylor purchased an ounce of cocaine from Mitchell in exchange for $850. Again, Taylor approached the backyard and a hand-to-hand exchange occurred through the side window. FBI

agents visually observed Mitchell exit the front door to Apartment D during the transaction, unlock the door and enter Apartment B, then exit Apartment B and re-enter Apartment D. Based on this behavior, Netemeyer believed that Apartment B was a stash house for the drugs that Mitchell sold. The FBI later tested the drugs and confirmed them to be 18.2 grams of cocaine base. The FBI monitored the transaction by audio and video tape, both of which the prosecutor introduced at trial. Mitchell's face did not appear on the video tape. Netemeyer prepared a transcript of the audio recording, which the prosecutor also provided to the jury, to aid them during its broadcast.

On June 29, 2001, the third buy, Taylor purchased two ounces of cocaine from Mitchell in exchange for $1,580.00. During this transaction, Mitchell invited Taylor inside Mitchell's apartment wherein Taylor observed Mitchell exit out the door and return later with the requested drugs. The surveillance units confirmed that Mitchell exited Apartment D, went down the sidewalk, unlocked the padlock to Apartment B, and returned later with what appeared to be a package in his hand. The FBI tested the drugs and confirmed them to be 36.4 grams cocaine base. The FBI also monitored the third transaction by audio and video recording. A transcript was prepared, authenticated by Netemeyer, and the prosecutor provided it to the jury during the tape's broadcast as an aid.

On July 2, 2001, Netemeyer obtained a search and arrest warrant based on the above investigation. During the search, Mitchell, two other individuals, and a child were present at 1602 Hanauer, Apartment D. The FBI arrested Mitchell and took him into custody. The FBI recovered a $20 bill from the June 29, 2001, drug transaction and keys to the Apartment B pad-

lock from Mitchell's pants/jacket pocket. Netemeyer asked Mitchell if there were any booby traps in Apartment B to which Mitchell replied, and Netemeyer was able to confirm Mitchell's voice.

During the search of Apartment D, the FBI agents recovered a small amount of marijuana, 1.9 grams of cocaine, .22 caliber ammunition, and nine live rounds of 9 millimeter ammunition. Netemeyer also recovered various paper documents from Apartment D, including: 1) mail addressed to Mitchell at the 1602 Hanauer address; 2) suspected drug records; and, 3) a Tennessee identification card issued to Mitchell at the 1602 Hanauer, Apartment D address. From Apartment B, the agents recovered weighing scales, seven .12 gauge shotgun shells, and a .12 gauge shotgun.

## III. DISCUSSION

On appeal, Mitchell argues that his conviction should be overturned due to several errors at his trial. First, Mitchell contends that the evidence as to his identity was insufficient to sustain his conviction. Second, Mitchell argues that the district court erred in allowing the jury to deliberate until 1:30 a.m. Third, Mitchell claims that the district court improperly admitted the audiotapes of the drug transactions and jail phone calls and improperly allowed the jury to be aided by the transcripts of those taped conversations. Fourth, Mitchell claims that the prosecutor engaged in prosecutorial misconduct by referring to the transcript of the audiotape in rebuttal closing argument. Finally, Mitchell argues that the district court erred in allowing Netemeyer to testify that a source advised him that Mitchell had a stash house next door. Each of these arguments will be addressed in turn.

### A. Sufficiency of the Evidence

Mitchell moved the district court for a judgment of acquittal due to the

insufficiency of the evidence. FED. R.CRIM. P. 29. The district court denied Mitchell's motion. This court reviews a challenge to the sufficiency of the evidence "in the light most favorable to the prosecution," to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (citation omitted). In undergoing this analysis, the court will not "weigh the evidence presented, consider the credibility of witnesses, or substitute our judgment for that of the jury." *United States v. M/G Transport Servs., Inc.*, 173 F.3d 584, 589 (6th Cir. 1999).

Mitchell claims that the testimony of Netemeyer and Taylor was insufficient to find him guilty. Specifically, Mitchell contends that Netemeyer was only an "ear witness" to the drug transactions and that Taylor was too incredible to identify Mitchell as the person who sold him drugs. Voice identification need not be by a witness who has heard the alleged speaker's voice firsthand. FED.R.EVID. 901(b)(5). Rather, "[t]he standard for the admissibility of an opinion as to the identity of a speaker is merely that the identifier has heard the voice of the alleged speaker at any time." *United States v. Cooke*, 795 F.2d 527, 530 (6th Cir.1986) (quoting *United States v. Rizzo*, 492 F.2d 443, 448 (2d Cir.1974)). Netemeyer testified that he was very familiar with Mitchell's voice because he monitored "dozens of phone calls coming out of the jail to his number at 1602 Hanauer." J.A. at 164. Netemeyer confirmed Mitchell's voice on the day he was arrested.

All of Mitchell's attacks on the credibility of Taylor go only to the quality of the government's proof, not the sufficiency of the evidence. *United States v. Sanchez*, 928 F.2d 1450, 1457 (6th Cir.1991) (explaining that any argument relating to the credibility of the government's witnesses is irrelevant to the court's determination of the sufficiency of the evidence). Accordingly, there was sufficient evidence of Mitchell's identity before the jury. Mitchell's appeal on this basis lacks merit.

## B. Jury Deliberations Until 1:30 a.m.

■ Mitchell claims that the district court erred by coercing the jury to deliberate until 1:30 a.m. Defense counsel neither objected to the length of deliberations, nor moved for a mistrial based on the trial court's alleged coercion of the jury. Thus, the issue was not properly preserved for appellate review and is subject to plain error review. FED. R.CRIM. P. 52(b); *United States v. LeBlanc*, 612 F.2d 1012, 1016–17 (6th Cir.1980). The "plain error doctrine is to be used sparingly, only in exceptional circumstances, and solely to avoid a miscarriage of justice." *United States v. Hook*, 781 F.2d 1166, 1172 (6th Cir.1986) (citations omitted). Plain error exists only if "errors are ... so rank that they should have been apparent to the trial judge without objection, or that strike at fundamental fairness, honesty, or public reputation of the trial." *United States v. Evans*, 883 F.2d 496, 499 (6th Cir.1989) (quoting *United States v. Causey*, 834 F.2d 1277, 1281 (6th Cir.1987)). That is not the case here.

Mitchell claims that the district court coerced the jury through its jury charge, and he further alleges that the hour the jury returned the verdict evidences coercion. "[A] trial court may properly encourage a deadlocked jury to continue its deliberations and attempt to reach a verdict." *United States v. Aloi*, 9 F.3d 438, 443 (6th Cir.1993) (citing *Allen v. United States*, 164 U.S. 492, 501–02, 17 S.Ct. 154, 41 L.Ed. 528, (1896)). It is clear, however, that jurors "may not be coerced into surrendering views conscientiously held."

*Jenkins v. United States,* 380 U.S. 445, 446, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965). In *Jenkins,* the jury sent the judge a note explaining that they could not agree on a verdict because of insufficient evidence. *Id.* The Supreme Court found the judge's instruction, "[y]ou have got to reach a decision in this case," to be coercive. *Id.* In determining whether or not an instruction is "coercive," a reviewing court must consider the circumstances surrounding the instruction and evaluate it in context. *Id.*

In this case, three hours into deliberations, the jury sent the district court a note stating that "[they] were not in agreement." J.A. at 309. After consulting with and receiving agreement from both counsel, the district court brought the jury out and instructed them as follows:

> From the Court's perspective, given a trial of this nature and complexity, that is not unusual. It is not unusual that a jury would not be in agreement at this time. Putting aside, even taking the most generous view of the amount of time spent in the deliberations, I would guess it has been about three and a half hours or something like that. That would not be a sufficient amount of time for the Court to say that --- even to re-charge you. The Court would simply ask that you continue with your deliberations, or we could take a break. By that, I mean you could take a break and eat something, and talk about something else for a certain period of time. Or you can take a break and you can come back in the morning. That is what I would ordinarily do in a situation like this. If one or more of you cannot come back in the morning, we might reconvene at a later time, after appropriate instructions. But I would not be able to say in good conscience, and given my responsibilities, that the deliberation and time

spent against the time of the trial and the complexity of the trial, that the time spent would be sufficient for me to say that you can't go forward. I think you are obligated to go forward. That's the Court's response, I guess. And I have discussed that with both counsel, and I think both counsel are in agreement. But they can speak for themselves, if they want to be heard otherwise.

> So why don't you retire for a few minutes and think about what your options are, and whether you would like to take a break now this evening, and come back later this evening, or whether you would like to come back in the morning, or whether you would like, if it is impossible in the morning, to come back at a later time.

J.A. at 310–11.

The district court's charge did not suggest that the jury was required to agree. After getting the above instruction, the jury returned to its deliberations and did not communicate with the district court. Some six hours later, they sent a note and informed the district court that they had come to a verdict on all but two counts. The district court advised counsel that it was going to accept a partial verdict. Thus, the jury, on its own, continued to deliberate despite the district court giving them the option to break or return at a later time. There was no indication by the jury that they were tired or unwilling to continue. *See, e.g., United States ex rel. Latimore v. Sielaff,* 561 F.2d 691 (7th Cir. 1977) (finding that the district court did not err in allowing the jury to deliberate into the morning hours when none of the jurors appeared to be exhausted or fatigued). Thus, the district court was not required to interrupt the jury deliberations and force them to take a break simply because of the time of night. *See, e.g., United States v. Stone,* 452 F.2d 42, 49

(8th Cir.1971) (finding that allowing the jury to deliberate until 1:15 a.m. was not an abuse of discretion). Under a plain error analysis, Mitchell's claim fails.

### C. Admission of Audiotapes and Transcripts

Admission into evidence of tape recordings, and transcripts of tape recordings is committed to the sound discretion of the trial court and is, therefore, reviewed for abuse of that discretion. *United States v. Elder*, 90 F.3d 1110, 1129 (6th Cir.1996).

Mitchell claims that the tapes of the drug transactions were inadmissible because they were unintelligible. Mitchell does not, however, identify which of the four audiotapes, much less which portions of the tapes, were unintelligible. The only support Mitchell provides for this allegation is a comment the prosecutor made in closing argument that some of the tapes were admittedly unintelligible. The government argues that there were portions of the tape that were unintelligible, but that those unintelligible portions did not render the entire tape untrustworthy. The government requested to fast forward through the portions of the tape that were unintelligible, but defense counsel urged the district court to play the tape in its entirety. The district court cannot now be said to have abused its discretion by granting Mitchell's own request.

In regard to Mitchell's jail phone calls, the only portion of the tape that defense counsel objected to pertained to Mitchell's contact with legal counsel and discussions about his prior convictions. Those tapes were redacted to exclude the prior conviction discussions at Mitchell's request. The government submits that those tapes were intelligible. Defense counsel did not object to their admissibility on that ground. Thus, the trial court did not abuse its discretion.

Mitchell objects to the use of transcripts of the audio tapes. The preferred practice is for the district court not to submit transcripts unless the parties stipulate to their accuracy. *United States v. Scarborough*, 43 F.3d 1021, 1024 (6th Cir. 1994). If the parties cannot agree, however, a second method is for the district court to determine the accuracy of the transcript by reading the transcript against the tapes in camera. *Id.* Mitchell argues that the transcripts were inaccurate without any supporting argument or authority. Mitchell fails to identify which portions of the transcripts he deems inaccurate. Because Mitchell was unwilling to identify the objectionable portions of the transcripts, the district court was unable to do a comparison of the tapes to the transcripts to determine the accuracy thereof.

The district court gave a cautionary instruction to the jury to use the transcripts solely as an aid. The transcripts were retrieved immediately following the broadcast of the tapes and did not go to the jury room. Mitchell has not shown that the transcripts were inaccurate or that he was prejudiced in any way. Accordingly, his claim fails.

### D. Prosecutorial Misconduct

Mitchell alleges that the prosecutor committed prosecutorial misconduct when he referred to the audiotape transcript in his rebuttal closing argument. This claim is reviewed under the plain error standard because defense counsel did not object to the prosecutor's remarks at trial. FED. R.CRIM. P. 52(b). In reviewing a claim of prosecutorial misconduct under the plain-error standard of review, the court must first determine whether the statements at issue were improper. *United States v. Carter*, 236 F.3d 777, 783 (6th Cir.2001). "[W]hen reviewing challenges to prosecu-

tor's remarks at trial, [this court] examine[s] the prosecutor's comments within the context of the trial to determine whether such comments amounted to prejudicial error." *Id.* This court "will not overturn a verdict unless the prosecutorial misconduct is 'so pronounced and persistent that it permeate[d] the entire atmosphere of the trial, ... or so gross as probably to prejudice the defendant.'" *United States v. Tocco,* 200 F.3d 401, 421 (6th Cir.2000) (quoting *Pritchett v. Pitcher,* 117 F.3d 959, 964 (6th Cir.1997)).

Mitchell objects to the prosecutor's statement in rebuttal closing argument in which he said, "if you look at the tape, specifically—if I can find it—the defendant talks about those other two people. (Brief pause) Right here, he says—this is the portion of the tape where they're talking about the other—one of the other persons, specifically, a guy from Nebraska. He said, 'Agent Wiley, he was from Nebraska. He don't know what was going on. He was just there visiting, basically.'" J.A. at 302. Mitchell argues that the government erred in referring to the text of the transcript as if the transcript itself were the evidence before the jury.

"As with tape recordings of communications, the use of a transcript of a recorded communication during trial is within the sound discretion of the trial court." *United States v. King, et al.,* 272 F.3d 366, 372 (6th Cir.2001) (quoting *United States v. Wilkinson,* 53 F.3d 757, 761 (6th Cir. 1995)). The defendant challenging the use of a transcript must show prejudice. *Scarborough,* 43 F.3d at 1025. "Use of transcripts not in evidence is permissible where the tape is in evidence, the defendant has not questioned the accuracy of the transcript, and the defendant has shown no prejudice." *Id.*

In *King,* the Sixth Circuit upheld the district court's ruling, over the objection of defense counsel, that allowed the prosecutor to refer to the transcript of an audio recording during his rebuttal closing argument. *King,* 272 F.3d at 372. As the referral to a transcript has been allowed in a case where there was an objection and a lesser standard of review applied, Mitchell can not succeed in showing that it was plain error for the prosecutor to refer to the transcript in this case.

### E. Netemeyer's Testimony Regarding His Source

█ Mitchell argues that the district court erred in allowing Netemeyer to testify regarding information he received from a confidential informant. At trial, defense counsel did not object to the challenged testimony. Accordingly, the plain error standard applies. FED. R.CRIM. P. 52(b).

Mitchell challenges the admission of Netemeyer's testimony, specifically that:

> [W]e spoke to another confidential informant who advised us that an associate of Mr. Mitchell's formerly resided in Apartment D. That individual had vacated the apartment. The utilities were cut off in that apartment and the apartment was essentially vacant. That individual also advised me that Apartment D was used as Mr. Mitchell's stash house and that he kept his drugs either in shoes that he stored in that apartment or in the furnace area.

J.A. at 143. Mitchell argues that the court should have *sua sponte* excluded the testimony.

The government argues that this testimony was not hearsay because it was not offered for the truth of the matter asserted. According to the government, Netemeyer was testifying to the events which led up to his investigation. Thus, the testimony was offered to provide the jury with the "'setting' of the case." *United States v.*

*Roberts, et al.,* 548 F.2d 665, 667 (6th Cir.1977). Netemeyer was entitled to explain that he had a suspicion that Mitchell had a stash house next door. Taylor and the government surveillance officer later corroborated Netemeyer's suspicion and the prosecution introduced that corroborating evidence at trial. Error, if any, was harmless and did not unfairly prejudice Mitchell.

## IV.  CONCLUSION

For the foregoing reasons we **AFFIRM** the conviction.