**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0857n.06
Filed: December 17, 2007

**No. 06-3254**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

UNITED STATES OF AMERICA,　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　Plaintiff-Appellee,　　　　　　)　　ON APPEAL FROM THE
　　　　　　　　　　　　　　　　　　　　)　　UNITED STATES DISTRICT
　　　　　v.　　　　　　　　　　　　　　)　　COURT FOR THE NORTHERN
　　　　　　　　　　　　　　　　　　　　)　　DISTRICT OF OHIO
　　　　　　　　　　　　　　　　　　　　)
DAVID TRINIDAD GONZALEZ,　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　Defendant-Appellant.　　　　　　)

_____

BEFORE: SILER, COOK, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

Defendant David Trinidad Gonzalez was named, along with 35 codefendants, in a 44-count indictment filed in the United States District Court for the Northern District of Ohio. Following a seven-day trial, a jury found Gonzalez guilty of conspiring to possess and distribute cocaine, cocaine base, and marijuana, in violation of 21 U.S.C. §§ 841(a) and 846, and possessing with the intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1). Gonzalez was sentenced to a statutory mandatory term of life imprisonment pursuant to 21 U.S.C. § 841(b). Gonzalez now appeals his conviction and sentence, arguing that the district court should have granted a mistrial due to statements by two witnesses that he had previously been incarcerated. Gonzalez contends further that the district court erred in enhancing his sentence pursuant to § 841(b), that the use of state court

convictions to enhance his sentence violated the Constitution's prohibition against Double Jeopardy, that the district court engaged in impermissible judicial fact-finding when it determined that he was a leader of a drug conspiracy and when it determined the quantity of drugs attributable to him, and that his sentence is procedurally unreasonable.

Finding each of these arguments without merit, we affirm Gonzalez's conviction and sentence.

I.

In May of 1998, Ohio Bureau of Criminal Investigation Officer Mark Apple began an investigation into drug trafficking in the Findlay, Ohio area. Apple began the investigation by conducting a series of controlled purchases of narcotics with the use of confidential informants. As the investigation progressed, Apple learned that the narcotics were being supplied by defendant David Gonzalez.

On September 5, 2000, a federal grand jury sitting in the United States District Court for the Northern District of Ohio returned a 44-count indictment against Gonzalez and 35 codefendants, alleging that Gonzalez and his codefendants conspired to sell cocaine, cocaine base ("crack"), and marijuana throughout the Toledo, Findlay, and Marion areas of Ohio. The indictment alleged that Gonzalez was the leader of the drug conspiracy that began in approximately 1987 and ran until the date of the indictment. Defendant was specifically charged in Count 1 of the indictment with conspiring to traffic narcotics, in violation of 21 U.S.C. § 841(a)(1), and in Count 33 with possessing with the intent to distribute approximately 8.907 kilograms of cocaine, in violation of 21 U.S.C. §

841(a)(1). Gonzalez's codefendants were arrested on September 7, 2000, but Gonzalez eluded arrest until his apprehension in 2003.

Prior to trial, 34 of Gonzalez's codefendants pleaded guilty to the charges alleged in the September 5, 2000, indictment.[1] Several of the codefendants agreed to cooperate with the authorities and testified against defendant at trial. Gonzalez's former girlfriend, Maribel Salvidar, who was not charged as a codefendant in this case, testified that she repeatedly traveled with Gonzalez to Chicago where he purchased cocaine that he later sold in Findlay.[2] Salvidar testified further that she traveled to Chicago with one or more of Gonzalez's cousins on defendant's behalf in order to purchase cocaine. Brian Shetzer, who assisted Officer Apple as a confidential informant, testified that he also traveled to Chicago to purchase drugs on defendant's behalf.[3] Shetzer testified that Gonzalez supplied him with an automobile equipped with a secret compartment, used to store cocaine.

Codefendant Terrance Chatman testified that he began trafficking narcotics in 1996. He started purchasing drugs from Gonzalez sometime in late 1997 or early 1998. Chatman testified that as he continued to purchase larger amounts from Gonzalez, defendant began fronting him between one and five kilograms of cocaine per week. Chatman testified further that, although he initially

---

[1]Codefendant Leonard Danny Smith, Jr. was charged in Counts 1 and 30 of the indictment. The charges against Smith were eventually dismissed.

[2]Salvidar was not named as a defendant in the federal indictment. It is unclear if she was charged in state court in relation to the conspiracy.

[3]Shetzer was not charged in the federal indictment, but was charged in Ohio state court in connection with the conspiracy. In exchange for his cooperation, Shetzer pleaded guilty and was sentenced to a twelve-year term of imprisonment.

purchased the cocaine from Gonzalez directly, as time progressed, Gonzalez had intermediaries deliver cocaine to Chatman on his behalf. Chatman testified that he received from defendant weekly or biweekly shipments of cocaine from 1998 until Chatman's arrest on September 7, 2000. The total amount of cocaine he received from Gonzalez was a "bare minimum" of 150 kilograms.

Codefendant Anthony Hines also testified against Gonzalez. Hines corroborated Chatman's account of his activities with defendant, testifying that he put Gonzalez in touch with Chatman in early 1998. Hines testified that Gonzalez had asked Hines if he knew anybody who was looking to distribute cocaine and that, in response, he had suggested Chatman. Hines testified that Chatman was interested in distributing drugs purchased from Gonzalez, and that Chatman purchased two kilograms of cocaine from Gonzalez at their first meeting. Hines testified further that he personally purchased at least 100 kilograms of cocaine from Gonzalez. Hines explained that Gonzalez would generally send an intermediary to deliver the cocaine to Hines. Hines also testified that he had repeatedly received drugs from one such intermediary, Gonzalez's cousin, codefendant Orlando Lerma, who often drove a black Buick Regal that contained a hidden compartment for carrying cocaine.

The jury also heard testimony from codefendant Robert Escobar. Escobar testified that sometime in 1993 or 1994 he purchased a half-kilogram of cocaine from defendant. Escobar then served four years in prison and was released in 1998. Shortly after Escobar was released, he began dealing with Gonzalez on a regular basis. Escobar estimated that he purchased an average of four kilograms of cocaine a week from Gonzalez, who usually sent an intermediary to deliver the drugs

to Escobar. Escobar identified codefendant Orlando Lerma as one such intermediary. Escobar testified that he occasionally made trips to Chicago to purchase cocaine on Gonzalez's behalf and that he also delivered large amounts of cash to defendant's apartment in Chicago.

The government also offered testimony by Alejandro Garza. Garza testified that he occasionally supplied Gonzalez with cocaine, estimating that he sold between 25 to 30 kilograms to defendant. Garza also testified that Gonzalez would send someone to pick up the cocaine in a black Buick Regal, equipped with hidden compartments to store the cocaine. Garza stated that he became partners with Gonzalez in a Chicago-area automobile dealership, Garza Auto Sales, and that during the partnership, defendant suggested that Garza install false compartments in cars.

In all, the government offered testimony by 26 different witnesses against Gonzalez. Following a seven-day trial, the jury found Gonzalez guilty of conspiracy to possess and distribute cocaine, cocaine base, and marijuana, in violation of 21 U.S.C. §§ 841(a) and 846, and possession with the intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1). The jury returned a special verdict form, reflecting its finding that Gonzalez conspired to distribute at least 5 kilograms of cocaine and less than 50 kilograms of marijuana and, further, that Gonzalez possessed with the intent to distribute at least 5 kilograms of cocaine.

Prior to sentencing, the presentence investigative report ("PSR") listed a base offense level of 38 for Gonzalez based on his involvement with more than 150 kilograms of cocaine. The PSR then recommended a four-point increase pursuant to U.S.S.G. § 3B1.1(a) because Gonzalez was alleged to have been a leader in the drug conspiracy. Gonzalez's criminal history computation

resulted in a score of 20, due in part to two drug-related felony convictions, entered in 1992 and 1993. Based on Gonzalez's offense level and criminal history, the Guidelines range was calculated to be 360 months to life. The PSR recommended, however, that because Gonzalez had two prior felony convictions, he was subject to a mandatory term of life imprisonment, pursuant to U.S.S.G. § 5G1.1(b) and 21 U.S.C. § 841(b). Gonzalez opposed the § 841(b) enhancement, but the district court overruled his objection and found that Gonzalez was eligible for the mandatory life sentence. After the district court imposed a life sentence, defendant timely appealed.

II.

Gonzalez first argues that the district court abused its discretion in denying his motion for a mistrial. He points to two statements made by witnesses that indicated that he had previously spent time in prison. Because each improper remark was unsolicited, in the course of appropriate questioning, and was only a small part of the evidence entered against Gonzalez, we conclude that the district court did not err in denying Gonzalez's motion for a mistrial.

We review the denial of a motion for mistrial for an abuse of discretion. *United States v. Martinez*, 430 F.3d 317, 336 (6th Cir. 2005). We consider five factors in determining whether mistrial is warranted by an improper reference to a defendant's prior imprisonment: "(1) whether the remark was unsolicited, (2) whether the government's line of questioning was reasonable, (3) whether the limiting instruction was immediate, clear, and forceful, (4) whether any bad faith was evidenced by the government, and (5) whether the remark was only a small part of the evidence against the defendant." *Id.* (quoting *Zuern v. Tate*, 336 F.3d 478, 485 (6th Cir. 2003)). "In making

this inquiry, the 'primary concern is fairness to the defendant.'" *United States v. Caver*, 470 F.3d 220, 243 (6th Cir. 2006) (quoting *United States v. Forrest*, 17 F.3d 916, 919 (6th Cir. 1994)).

The first incident of improper testimony occurred during the direct examination of codefendant Anthony Hines. After Hines explained that he pleaded guilty in connection with the conspiracy and that he was testifying in exchange for a possible reduction in his sentence, the prosecutor then asked Hines to describe when and through whom he first met Gonzalez, and to identify Gonzalez before the jury. After Hines identified Gonzalez, the prosecutor asked Hines to explain his first meeting with Gonzalez:

> Q:    Now, Mr. Hines, when you met Mr. Gonzalez, when Mr. Humphrey
>        introduced you to Mr. Gonzalez, what purpose was that for?
>
> A:    We was just out at the store and Humphrey told me that he served time with
>        Chico and me and Humphrey served time together.

Gonzalez's counsel objected immediately. The court sustained the objection, cautioning the jury that "the prior answer is to be stricken and you are to disregard it."

A sidebar followed, during which Gonzalez's attorney moved for a mistrial. The prosecutor then explained that Hines's statement regarding Gonzalez's previous incarceration was unprompted and against the prosecutor's earlier instructions:

> I would note that I did warn the witness, and I think if the Court heard Mr. Chatman's
> testimony and how carefully he avoided the subject, that much will be clear. And,
> in fact, I warned them again this morning in the presence of all three; and Mr. Hines
> apparently didn't get the message, so – I had specifically told him not to mention that
> and he did, in fact, mention it.
>
> If the Court is at all concerned it'll come up again, we may just want to bring him
> over at sidebar and sternly admonish him not to bring that subject up again.

Counsel for Gonzalez responded by arguing that the "Cat's out of the bag. I don't know what curative instruction you could give that would not prejudice [Gonzalez] in front of the jury," but the court instructed the attorneys that it would postpone argument and a decision on defendant's motion.

The second mention of Gonzalez's prior incarceration occurred during the direct examination of codefendant Alexander Franco. Before Franco testified, the district court instructed the witness that he should not mention that Gonzalez had previously spent time in prison:

> I want you to understand that at no time during your examination or cross-examination should you mention anything about David Trinidad Gonzalez being in jail, arrested, serving time in prison or anything. Stay away from it. If you have to, say, I'm sorry, I can't answer that. Fine. All right?

Nevertheless, after Franco identified Gonzalez in the courtroom, he testified that he met Gonzalez shortly after defendant was released from prison:

> Q:   Tell us, sir, how you met Mr. Gonzalez.
>
> A:   I met him through Tony Gonzalez at Tony's house. David was just getting released. I guess he just –

Gonzalez's attorney raised an objection immediately, which the district court sustained.

At the close of testimony, the district court considered and denied Gonzalez's motion for a mistrial:

> Gentlemen, in anticipation of the renewal or the argument on the motion, last evening I had done some research, and I asked this afternoon for my law clerks to do the same and pull out some cases from the Sixth Circuit.
>
> There is a recent case, last month, unpublished, but per curiam of an outstanding panel. The case is [*United States v. Tate*, 124 F. App'x 398 (6th Cir. 2005)], filed March 3, 2005. In this case, a witness had been previously advised not to discuss the incarceration of, I believe it was, yeah, the defendant.

It was blurted out. The judge did not hear it, and, therefore, did not give a cautionary instruction, as I did in the Hines, H-i-n-e-s, situation, and ordered stricken in the [Franco] situation this afternoon. The reason I don't give an expansive cautionary instruction is because I believe it can be more prejudicial to the defendant than valuable to the defendant.

In the *Tate* case, the Court didn't hear it, did not give a cautionary instruction; it was clearly error. The Court of [A]ppeals said the following: Quote, we consider five factors in determining whether a mistrial is warranted after an improper reference. One, whether the remark was unsolicited; two, whether the Government's line of questioning was reasonable; three, whether the limiting instruction was immediate, clear, and forceful . . . four, whether any bad faith was evidenced by the Government; and, five, whether the remark was only a small part of the evidence against the defendant.

Three of these five considerations concern the Government's responsibility for the admission of the improper comment, unquote, citing a line of cases out of the Sixth Circuit.

Clearly, the Government played no role in these improper statements. First, it was clear that the Government had instructed the witness Hines not to reference it. In the second instance, I personally from this bench instructed the witness [Franco] not to touch it.

Clearly, the line of reasoning – line of questioning was appropriate, and there was no complicity in the remarks by the Government. The Court concluded on this issue, quote, On the whole, it appears that the improper comment was inadvertent, isolated, in this instance, not clearly stated, and constituted only a very small part of the total evidence against Tate. Accordingly, we conclude that the trial court did not abuse its discretion in denying Tate's motion for new trial, unquote.

In my opinion, out of the 27 witnesses, counting Mark Apple twice, the remarks were isolated, inadvertent, unsolicited, and were certainly vastly outweighed by the quantum of evidence, from my viewpoint, which if believed would justify a finding against the defendant, a verdict against the defendant.

I find no justification in granting a motion for mistrial, based upon those two isolated remarks, and I, therefore, deny the motion.

We agree with the district court that the application of the five relevant factors suggests that a mistrial was not warranted. Here, it is undisputed that the witnesses' misstatements were not the result of any impropriety by the government. The prosecutor instructed each witness not to mention Gonzalez's prior incarceration and the unsolicited remarks were made in response to a clearly legitimate line of reasoning. Thus, factors one, two, and four all counsel against granting a mistrial.

Moreover, with regard to the misstatement by Hines, the district court gave a clear and forceful limiting instruction, quickly commanding the jury to disregard Hines's statement. Likewise, the district court sustained Gonzalez's objection to Franco's statement, instructing the jury to "disregard anything" that Franco had testified to immediately before. The district court explained later that it did not issue more expansive limiting instructions "because I believe it can be more prejudicial to the defendant than valuable to the defendant." The court's decision was reasonable in this context, where each improper statement was made in passing; it is possible that the jurors had not picked up on either mention of Gonzalez's incarceration. Finally, as the district court noted, the jurors received testimony from 26 different witnesses. Thus, the unsolicited remarks were only small parts of the evidence offered against Gonzalez.

On appeal, Gonzalez also contends that a mistrial was warranted due to instructions given by the district court to the jury concerning "verbal altercations, yelling, in the hallway" during a break and instructions concerning witness tampering that were provided in front of the jury. Specifically, Gonzalez argues that the following instructions given by the district court in front of the jury prejudiced him and warranted a mistrial:

Ladies and gentlemen, prior to the recalling of the jury to the box, it was brought to the Court's attention through multiple individuals who made reports to the Court on the record that there had been verbal altercations, yelling, in the hallway during the last break. As a result thereof, the Court was ready to permit any participant in those altercations back in the courtroom, but with enhanced presence of Marshals and those under the control of the []Marshal Service.

Counsel for the defendant and the defendant advised the Court that they have requested that family members absent themselves from the courtroom and the courthouse for the remainder of the day. That being the case, enhanced security will not be necessary.

I want to make it very clear that if anyone returns to the courtroom and should make any outbursts, make any untoward gestures during court proceedings, they will be asked to leave the courtroom. And if not, will be escorted out.

Further, reports from multiple sources have reached this Court with respect to unauthorized and illegal contact with members of the family of witnesses or prospective witnesses or with members – with those witnesses themselves either attempting to or threatening to intimidate witnesses who have been or may be called to this courtroom in this case. This order applies to everyone in this case. There shall be no direct or indirect contact *by family members or friends of the defendant* or anyone else with anyone directly or indirectly connected with a witness, prospective witness, or a witness who has already testified for either side. It is inappropriate and the Court will not tolerate it.

There is no indication in the record or in his brief on appeal that Gonzalez moved for a mistrial on this basis. Thus, we review for plain error Gonzalez's argument for a mistrial as it relates to the district court's statement. *Caver*, 470 F.3d at 245; *United States v. Kincaide*, 145 F.3d 771, 781 (6th Cir. 1998). Under plain error analysis, "[b]efore this court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affects substantial rights. If those three factors are met, then this court may exercise its discretion to notice a forfeited error (4) if the error

seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Maliszewski*, 161 F.3d 992, 1003 (6th Cir. 1998) (internal citation and quotation omitted).

There is little case law that is directly relevant here. Neither party cites, and we do not find, any cases discussing the propriety of commenting upon allegations of witness tampering in the presence of the jury. To some extent, this fact, in and of itself, suggests that the district court did not commit plain error in failing to sua sponte order a mistrial. *See United States v. Jones*, 108 F.3d 668, 672 (6th Cir. 1997) (en banc) (observing that due to lack of guidance in the case law, "any error in the trial court's instruction is far from 'clear' or 'obvious.'"). Nevertheless, the district court's mistake here is self-evident: not only did the district court indicate that attempted witness tampering had occurred, but also singled out the defendant and his family and friends as sources of the tampering. *See United States v. Olano*, 507 U.S. 725, 734 (1993) (explaining that the term "plain" is "synonymous with 'clear' or, equivalently, 'obvious.'"); *United States v. Forrest*, 620 F.2d 446, 457 (5th Cir. 1980) (expressing concern that juror who was tampered with could taint the other jurors, despite the juror's statement that she had not mentioned the tampering attempt to any other juror, because "[e]ven a passing reference to the merits of the case or to the contact would have carried the potential for prejudice"); *but see United States v. Evans*, 542 F.2d 805, 814 (10th Cir. 1976) (finding no abuse of discretion in denial of mistrial where juror received letter from defendant; upon learning of letter, district court interrogated jury as a whole concerning the letter, asked jury whether it affected their ability to weigh the evidence, and instructed jury to disregard the letter). It is difficult to say, therefore, that the district court's error here was not "plain."

Although there is a lack of controlling case law on this issue, there is support for the proposition that the suggestion in the presence of the jury that a witness fears retribution from the defendant does not necessarily warrant a mistrial. *See Caver*, 470 F.3d at 245 (affirming district court's denial of motion for mistrial based on witness's refusal to disclose his city of residence out of fear that defendant will have "somebody kill my daughter and my kids"); *United States v. Bagby*, 451 F.2d 920, 930 (9th Cir. 1971) (finding no plain error in failing to grant mistrial where counsel for witness stated, in the presence of the jury, that he was concerned about the safety of his witness due to retribution by the defendant). The facts here differ from *Caver* and *Bagby* in two significant respects, however. First, the statements concerning tampering came not from a witness or the prosecutor, but rather from the court. Second, the statements at issue in *Caver* and *Bagby* involved the possibility of tampering. Here, the district court stated that witness tampering had, in fact, been attempted.

We are troubled by the district court's decision to issue its warning in the presence of the jury. Any potential prejudice was entirely avoidable. The warning was not directed towards the jury, but rather to the parties and the courtroom gallery. There was simply no need for the jury to hear allegations of witness tampering, and the more prudent approach would have been to issue the warning in the jury's absence. Moreover, our reading of the record suggests that the jury entered the courtroom immediately prior to the district court's warning. We are perplexed as to why the court waited until the jury was present to disclose allegations of witness tampering, rather than simply issuing his warning before the jury's arrival.

Under the plain error standard, we take into account the propriety of the district court's decision, together with the evidence offered against the defendant. *United States v. Jackson*, 473 F.3d 660, 672 (6th Cir. 2007) (finding no plain error because, *inter alia*, "the evidence against Jackson was, if not overwhelming, undeniably strong"); *see also United States v. Mitchell*, 104 F. App'x 544, 548 (6th Cir. 2004) (The "plain error doctrine is to be used sparingly, only in exceptional circumstances, and solely to avoid a miscarriage of justice.") (quoting *United States v. Hook*, 781 F.2d 1166, 1172 (6th Cir. 1986)). Given that the evidence offered against Gonzalez at trial was overwhelming, we cannot conclude that the district court's admonishment concerning witness tampering amounted to plain error.

## III.

Next, Gonzalez contends that the district court erred in finding that he was subject to a mandatory life sentence pursuant to 21 U.S.C. § 841(b). Gonzalez raises two arguments: (1) that it was within the province of the jury, rather than the district court, to determine whether Gonzalez's prior convictions made him eligible for a sentence enhancement under § 841(b); and (2) that his 1992 and 1995 convictions for aggravated trafficking in drugs arose from conduct that occurred during the conspiracy for which he was presently convicted and should therefore have been treated as overt acts in furtherance of the conspiracy rather than as prior predicate offenses. Because we have considered and rejected these arguments in prior cases, we conclude that the district court did not err in finding that Gonzalez was subject to a mandatory life sentence pursuant to § 841(b).

We have consistently rejected Gonzalez's position that the Sixth Amendment and the

Supreme Court's opinion in *United States v. Booker*, 543 U.S. 220 (2005), require that the jury find

facts necessary to apply sentencing enhancements. In *United States v. Mickens*, 453 F.3d 668, 673

(6th Cir. 2006), we explained that post-*Booker*, the district court retains the ability to enhance a

defendant's sentence based upon facts proven by a preponderance of the evidence or admitted to by

a defendant so long as the court "appreciates that the guidelines are advisory, not binding."

In *United States v. Barnett*, 398 F.3d 516 (6th Cir. 2005), we considered whether *Booker* or

its precursor, *Apprendi v. New Jersey*, 530 U.S. 466 (2000), prohibited the trial judge from

determining the nature of the defendant's prior convictions for purposes of applying sentence

enhancements under the analogous Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e). The

*Barnett* court rejected the appellant's argument that sentencing enhancements were the province of

the jury, explaining:

> Existing case law establishes that *Apprendi* does not require the nature or character of prior convictions to be determined by a jury. In *Apprendi*, the Supreme Court expressly excepted the fact of a prior conviction from the rule requiring issues of fact that increase a defendant's penalty to be submitted to the jury. 530 U.S. at 490. This Court, among others, has rejected the argument that *Apprendi* requires the nature of prior convictions to be determined by a jury, holding instead that the district court's authority to determine the existence of prior convictions was broad enough to include determinations regarding the nature of those prior convictions. For example, in *United States v. Becerra-Garcia*, 28 F. App'x 381, No. 99-6205, 2002 WL 22038, at *3-5 (6th Cir. 2002) (unpublished opinion), a panel of this Court held that a district court did not violate *Apprendi's* Sixth Amendment holding by determining whether the defendant's prior conviction was for an aggravated felony. In *Becerra-Garcia*, we cited a number of courts that have reached similar conclusions, such as the Eighth Circuit, which, in *United States v. Campbell*, 270 F.3d 702, 707-09 (8th Cir. 2001), held that *Apprendi* does not require the nature of a defendant's prior felony offenses

as "violent felonies" or "serious drug offenses" under the Armed Career Criminal Act to be proved to a jury.

In the present case, Barnett, like the defendant in *Campbell*, claims that the failure of the district court to submit to the jury the question of the nature of his prior convictions under the Armed Career Criminal Act violated *Apprendi*. Given the case law establishing that *Apprendi* does not require the nature of prior convictions to be determined by a jury, we reject Barnett's argument on this issue. Moreover, there is no language in *Booker* suggesting that the Supreme Court, as part of its remedial scheme adopted in that case, intended to alter the exception to *Apprendi* allowing district courts to consider the fact and nature of prior convictions without submitting those issues to the jury. Thus, for the foregoing reasons, we hold that there was no Sixth Amendment violation in the present case.

*Barnett*, 398 F.3d at 524-25.

We have since rejected the precise argument raised by Gonzalez: that the fact of his prior convictions necessary to apply sentence enhancements pursuant to 21 U.S.C. § 841(b) must be found by a jury rather than the trial judge. *United States v. Mooneyham*, 473 F.3d 280, 295 (6th Cir. 2007) ("The district court applied the mandatory minimum of 120 months because, under 21 U.S.C. § 841(b)(1)(B), the defendant had a prior felony drug conviction. Contrary to the defendant's insistence, nothing in *Apprendi* . . . requires that the fact of that prior conviction be established on the record by independent evidence."); *United States v. Paige*, 470 F.3d 603, 612 (6th Cir. 2006) (rejecting defendant's argument that sentence enhancement applied pursuant to 21 U.S.C. § 841(b)(1)(A) due to defendant's prior convictions violated Sixth Amendment because "as the Supreme Court reaffirmed in *Booker*, the fact of a prior conviction is excepted from the factfinding requirements of the Sixth Amendment"); *see also United States v. Bowen*, 194 F. App'x 393, 404 (6th Cir. 2006) ("The district court here did just what *Apprendi*, even after *Booker*, allowed it to do,

in finding [the defendant] had at least two prior felony convictions that qualified for a higher mandatory minimum under § 841(b)(1)(A). Therefore the district court did not commit plain error in finding [the defendant] had committed at least two prior felonies that, combined with the drug quantity of which he was found guilty, made him eligible for the mandatory minimum sentence of life imprisonment under 21 U.S.C. § 841(b)(1)(A)."). We are bound by our prior decisions in *Barnett*, *Mooneyham*, and *Paige* and, therefore, must reject Gonzalez's position.

Gonzalez also contends that the district court erred in finding that his 1992 and 1995 Ohio state convictions for aggravated trafficking in drugs were separate and distinct crimes rather than merely overt acts in furtherance of the conspiracy for which he was convicted in the present case. He contends that because the 1992 and 1995 convictions arose from conduct that occurred during the conspiracy, the prior drug convictions and the conspiracy "should be treated as one crime because they were part of a 'single, common scheme.'"

Because Gonzalez is raising the statutory question of whether convictions that occurred during the span of a conspiracy should be considered separate offenses from the conspiracy, we review his claim de novo. *United States v. Thomas*, 211 F.3d 316, 319 (6th Cir. 2000) ("'Since determining whether the conduct was a single occasion or multiple occasions" under the ACCA "presents a legal question concerning the interpretation of a statute, we review the district court's decision de novo'") (quoting *United States v. Murphy*, 107 F.3d 1199, 1208 (6th Cir. 1997)); *see also United States v. Jones*, 205 F. App'x 327, 335 (6th Cir. 2006) (assuming, without deciding, that this court reviews a district court's decision to count a defendant's prior convictions as separate

predicate offenses for purposes of 21 U.S.C. § 841(b)(1)(A) under a de novo standard rather than for clear error).

Gonzalez was convicted of conspiracy to possess and distribute cocaine, cocaine base, and marijuana, in violation of 21 U.S.C. §§ 841(a) and 846, and possession with the intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1). Section 841(a) declares that "it shall be unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance . . . ." 21 U.S.C. § 841(a)(1).[4] The penalty provision, set forth in 21 U.S.C. § 841(b)(1)(A)(ii), provides that a defendant found guilty of conspiring with the intent to distribute five or more kilograms of cocaine is subject to a "term of imprisonment which may not be less than 10 years or more than life . . . ." The statute, however, mandates a more severe penalty for repeat offenders, stating that any defendant who is convicted under § 841(a)(1) "after two or more prior convictions for a felony drug offense have become final . . . shall be sentenced to a mandatory term of life imprisonment without release and fined in accordance with the preceding sentence." 21 U.S.C. § 841(b)(1)(A)(ii).

Following trial, the PSR detailed Gonzalez's criminal background. The PSR identified at least two prior felony drug convictions that qualified as predicate offenses under 21 U.S.C. § 841(b): a 1992 Ohio conviction for aggravated trafficking in drugs, for which Gonzalez was sentenced to a term of 18 months of imprisonment, and a 1995 Ohio conviction for aggravated trafficking in drugs,

---

[4]"Any person who attempts or conspires to commit any offense defined in this title shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 21 U.S.C. § 846.

for which Gonzalez was sentenced to a term of 18 months of imprisonment.[5]  Gonzalez then filed

a response in opposition to the government's pretrial motion that declared its intention to use

Gonzalez's 1992 and 1995 convictions to enhance Gonzalez's sentence.[6]  Gonzalez argued, *inter*

*alia*, that these convictions occurred during the term of the conspiracy and, thus, "cannot be

considered as factors for increasing the defendant's sentence as they did not occur prior to the instant

offense."  The district court rejected Gonzalez's argument, concluding that under our opinion in

*United States v. Hughes*, 924 F.2d 1354 (6th Cir. 1991), Gonzalez's 1992 and 1995 convictions

should be considered separate, prior convictions under § 841(b).

The district court correctly viewed *Hughes* as controlling.  In *Hughes*, we considered the

precise question raised by Gonzalez here:  whether an underlying felony drug conviction that occurs

during a running conspiracy may be considered a separate predicate offense for purposes of a

sentence enhancement under 21 U.S.C. § 841(b).  *Hughes*, 924 F.2d at 1358.  The *Hughes* defendant

was indicted, and ultimately convicted, for conspiring to possess with the intent to distribute at least

five kilograms of cocaine.  *Id.* at 1356.  The indictment alleged that the conspiracy ran from March 1,

1988, until December 6, 1988.  *Id.*  At the time of the indictment, the defendant had previously

---

[5]In addition to these two felony drug convictions, Gonzalez was also convicted in Illinois state court in 1988 of delivery of a controlled substance and was sentenced to a term of five years of incarceration.  In 1993, Gonzalez was also charged in Ohio on two counts of aggravated trafficking in drugs and sentenced to two years of prison on each count, to be served concurrently.

[6]In *United States v. Spikes*, 158 F.3d 913, 932 (6th Cir. 1998), we confirmed that an aggravated drug trafficking conviction under OHIO REV. CODE § 2923.02(A) is a predicate offense under 21 U.S.C. § 841(b).

- 19 -

pleaded guilty in Michigan state court to a felony charge of possession of cocaine, arising out of a

drug raid that occurred on March 4, 1988. *Id.* at 1355-56. Due to his Michigan felony conviction,

the district court found that the 20-year mandatory minimum sentence provided in § 841(b) for

offenders with one prior felony drug conviction was applicable. *Id.* at 1358.

The defendant appealed, arguing that the prior Michigan felony conviction was inapplicable

to § 841 as a matter of law because the prior offense occurred during the course of the conspiracy.

*Id.* We rejected the defendant's argument, reasoning:

> We conclude that the district court properly determined that the twenty-year
> mandatory minimum applied to Hughes because, at the time of his offense, Hughes
> had a prior felony drug conviction which arose from a separate criminal episode, an
> offense that was distinct in time. An episode is an incident that is part of a series, but
> forms a separate unit within the whole. Although related to the entire course of
> events, an episode is a punctuated occurrence with a limited duration. The criminal
> events that constitute the bases for Hughes' conviction for possession of cocaine and
> his subsequent conviction for conspiracy do not represent a single criminal episode.
> Such events occurred at distinct times spanning a nine-month period. The initial drug
> raid, which precipitated the state conviction, occurred on March 4, 1988. The drug
> raid which gave rise to Hughes' conspiracy conviction occurred on December 6,
> 1988. The conspiracy, alleged to have commenced on March 1, 1988, ceased more
> than nine months *after* the possession offense occurred and approximately three
> months *after* the conviction for possession of cocaine became final. The possession
> of cocaine constituted one episode which concluded with the first drug raid on
> March 4, 1988. In contrast, the conspiracy to possess with intent to distribute and to
> distribute cocaine constituted another episode that did not conclude until
> December 6, 1988. While the raids occurred at the same residence and involved the
> same type of controlled substance, the intervening amount of time and the finality of
> the state felony drug conviction lead us to conclude that the twenty-year mandatory
> minimum was properly applied.
>
> Our finding that the state felony conviction is a proper predicate for sentencing
> enhancement within the meaning of § 841(b)(1)(A) is further supported by an
> examination of the facts of this case in light of the statute's legislative purpose to
> punish recidivists more severely. After Hughes' state felony conviction, which

> became final in September 1988, Hughes was given ample opportunity to discontinue
> his involvement in unlawful drug-related activity. That the conspiracy was intact
> some nine months after the March 4, 1988, raid and three months after the resulting
> conviction heightens Hughes' culpability. Hughes' repeated criminal behavior is the
> kind Congress targeted for imposition of a harsher penalty by § 841(b)(1)(A).

*Id.* at 1361-62.

Although Gonzalez argues to the contrary, *Hughes* is controlling here. Gonzalez contends the "test set forth in *Hughes* cannot be met because the prior convictions are, technically, not prior convictions at all. Chronologically, they arise after the conspiracy began." Defendant, however, is mistaken. As is the case here, the *Hughes* defendant's prior state court conviction and its underlying activity occurred during the span of the conspiracy. *Hughes*, 924 F.2d at 1355 (explaining that the defendant's June conviction arose out of conduct occurring on March 4, 1988). Thus, *Hughes* does not require the prior convictions to become final before the conspiracy begins to run. Moreover, as was the case in *Hughes*, the conspiracy for which Gonzalez was ultimately convicted continued long after his 1992 and 1995 convictions were finalized. Following the logic of *Hughes*, after Gonzalez's state court convictions became final, he had the opportunity to discontinue any illegal narcotic activity. That the conspiracy, however, continued until 2000 precludes Gonzalez's argument that his conspiracy conviction and his prior state drug trafficking offenses were a single incident.

Finally, it bears noting that we have continued to follow *Hughes* in the wake of *Apprendi* and *Booker*. *See Paige*, 470 F.3d 603, 610 n.3 (observing that "for purposes of enhancement under § 841(b)(1), convictions for conduct occurring on separate dates are counted separately even though they may have been related in purpose and even if the sentences were ordered to run concurrently");

*United States v. Gardner*, 23 F. App'x 482, 483-84 (6th Cir. 2001) ("The criminal events that form the bases for [the defendant's] 1971 conviction and his instant conviction for conspiracy do not represent a single criminal episode, but are separate episodes which occurred at distinct times spanning a twenty-four year period. His continued involvement in a drug conspiracy after his prior conviction is the specific type of repeated criminal behavior which Congress targeted for harsher penalties in § 841(b)(1)(A).").

Furthermore, our sister circuits have construed 21 U.S.C. § 841(b) in line with *Hughes*. *See United States v. Murphy*, 169 F. App'x 775 (4th Cir. 2006) ("The prior predicate conviction for distribution of crack cocaine, although occurring during the course of an 18-year long conspiracy, was properly used to enhance the mandatory statutory minimum sentence."); *United States v. Martino*, 294 F.3d 346, 350-51 (2d Cir. 2002) (holding that § 841(b) enhancement is appropriate because defendant's prior drug felony conviction was a separate, prior offense from his conspiracy conviction because the defendant "continued to engage in significant acts in furtherance of the conspiracy . . . for more than two years after the state conviction became final"); *United States v. Johnston*, 220 F.3d 857, 861-62 (8th Cir. 2000) (holding that prior state court convictions could be considered for § 841(b) enhancement even though they occurred during span of conspiracy because the conspiracy conviction "stemmed from conduct spanning three calendar years, while the [prior state conviction] stemmed from conduct on a single day, and thus was a 'punctuated occurrence with a limited duration.'"); *United States v. Garcia*, 32 F.3d 1017, 1019-20 (7th Cir. 1994) (rejecting the defendant's argument on appeal "that a prior conviction should apply for purposes of the mandatory

minimum only if the conspiracy *commences* after the conviction becomes final" because after defendant's "conviction for possession of cocaine became final, he continued to engage in drug-related activities for eighteen months"); *United States v. Pace*, 981 F.2d 1123, 1132 (10th Cir. 1992), *abrogated in part on other grounds by Edwards v. United States*, 523 U.S. 511 (1998) (rejecting defendant's argument that because the substantive offenses also were alleged as overt acts in support of the conspiracy they were not separate criminal episodes because "[c]onspiracy is a crime separate from the substantive violation . . . .").

Thus, we hold that the district court did not err in finding that Gonzalez was subject to 21 U.S.C. § 841(b)'s mandatory minimum of life imprisonment.

IV.

Gonzalez also argues that the use of his 1992 and 1995 Ohio state convictions to enhance his sentence violates the Double Jeopardy Clause of the Constitution. We review Gonzalez's double jeopardy challenge de novo. *United States v. Flowal*, 163 F.3d 956, 963 (6th Cir. 1998).

In *United States v. Mack*, 938 F.2d 678 (6th Cir. 1991), we considered whether the enhancement of a sentence pursuant to the Sentencing Guidelines for prior criminal activities constituted "punishment" under the Double Jeopardy Clause for those prior activities. The *Mack* court began its analysis by identifying the three guarantees of the Double Jeopardy Clause: the Clause "protects against a second prosecution for the same offense after acquittal; against a second prosecution for the same offense after conviction; and against multiple punishments for the same offense." *Id.* at 679. The question raised by the *Mack* defendant, and by Gonzalez here, is "whether

or not there have been multiple punishments for the same offense." *Id.* We joined the Fifth, Seventh, and Tenth Circuits in holding that the Double Jeopardy Clause is not implicated when a defendant faces an enhanced sentence for prior criminal conduct, explaining:

> The consideration of collateral conduct for purposes of sentence enhancement is not new. Section 1B1.3 of the Sentencing Guidelines simply memorializes a long standing practice of trial judges. Prior convictions of a defendant routinely are used to determine the quantity of sentence. If Appellant is correct, then any consideration is a second punishment and therefore violative of the Double Jeopardy Clause.

> An enhanced sentence because of a prior conviction is no more double jeopardy than is a consideration of other relevant conduct, including the likelihood of a subsequent conviction.

*Id.* at 680-81 (citing *Sekou v. Blackburn*, 796 F.2d 108 (5th Cir. 1986), *United States v. Troxell*, 887 F.2d 830 (7th Cir. 1989), and *United States v. Koonce*, 885 F.2d 720 (10th Cir. 1989)). We have since applied *Mack* to reject an argument that a sentence enhancement under 21 U.S.C. § 841(b) for previous drug convictions constitutes a violation of the Double Jeopardy Clause. *United States v. Pruitt*, 156 F.3d 638, 646 (6th Cir. 1998); *Flowal*, 163 F.3d at 963; *see also United States v. Stone*, 218 F. App'x 425, 442 (6th Cir. 2007). We are bound by *Mack*, *Pruitt*, and *Flowal* and, therefore, reject Gonzalez's Double Jeopardy challenge.

V.

Next, Gonzalez argues that the district court erred in finding that he was the leader of the drug conspiracy and that, as the leader, 150 kilograms of cocaine could be attributed to him. Gonzalez contends that the district court exceeded its authority in making these findings and that *Booker* required these facts to be found by the jury. Gonzalez's claims are without merit.

As we explained recently in *United States v. Flores*, 477 F.3d 431 (6th Cir. 2007), district courts are not precluded from engaging in fact-finding at sentencing:

> We have held repeatedly that *Booker* and its precursor, *Apprendi v. New Jersey*, 530 U.S. 466 (2000), did not eliminate judicial fact-finding during sentencing. Rather, district courts must "calculate the Guideline range as they would have done prior to *Booker*, but then sentence defendants by taking into account all of the relevant factors of 18 U.S.C. § 3553, as well as the Guidelines range." *United States v. Stone*, 432 F.3d 651, 655 (6th Cir. 2005); *see also United States v. Mickens*, 453 F.3d 668, 673 (6th Cir. 2006). Moreover, *Apprendi* is not triggered so long as the judicial findings of fact do not result in the defendant receiving a sentence that exceeds the statutory maximum. *United States v. Hough*, 276 F.3d 884, 890 (6th Cir. 2002); *United States v. Schulte*, 264 F.3d 656, 660 (6th Cir. 2001); *see also United States v. Woods*, 39 F. App'x 72, 75 (6th Cir. 2002) (unpublished) ("This court has declined to require that enhancements imposed pursuant to the Guidelines be found by a jury beyond a reasonable doubt as long as the sentence imposed does not exceed the statutory maximum.").

*Flores*, 477 F.3d at 438-39; *see also United States v. Jones*, 489 F.3d 243, 250 (6th Cir. 2007) (holding that district court did not err in using a preponderance-of-the-evidence standard to determine the quantity of cocaine base that the defendant possessed and distributed). Thus, the district court did not err in making findings of fact at sentencing concerning Gonzalez's role in the conspiracy and the amount of drugs that could be attributed to him.

Moreover, even if the district court were limited to the jury's findings at sentencing, Gonzalez cannot demonstrate that he was harmed by the district court's findings on these matters because he was ultimately sentenced to a statutory mandatory sentence of life imprisonment. The jury returned a special verdict form, finding defendant responsible for at least five kilograms of cocaine. This finding, along with defendant's two prior felony drug convictions, made Gonzalez eligible for the mandatory minimum life sentence provided in 21 U.S.C. § 841(b)(1)(A). Thus, even

if the district court was restricted to the jury's findings concerning the quantity of drugs and defendant's role in the conspiracy, Gonzalez would nevertheless be subject to a mandatory term of life imprisonment.

VI.

Finally, Gonzalez argues that his sentence is procedurally unreasonable. Because Gonzalez was sentenced to a mandatory sentence under § 841(b)(1)(A), we must reject Gonzalez's reasonableness claim.

We have explained that where a defendant is sentenced to a statutory mandatory minimum sentence, *Booker* is not implicated and any *Booker* error, therefore, does not require resentencing. *Paige*, 470 F.3d at 612 (noting that even when defendant is sentenced under the erroneous belief that the Guidelines are mandatory, "remand is not required by *Booker* when the defendant has been sentenced to a statutory mandatory minimum sentence"); *United States v. Smith*, 419 F.3d 521, 532 (6th Cir. 2005) (declining to remand despite *Booker* error because "if his case were remanded, the district court would not have the discretion to impose a shorter term of imprisonment"); *see also United States v. Joiner*, 123 F. App'x 681, 683 (6th Cir. 2005) (declining to remand where defendant received mandatory minimum sentence under 21 U.S.C. § 841(b)(1) and explaining "even under the *post-Booker* sentencing scheme, the Defendant would not be entitled to a lower sentence. The mandatory Guidelines had no effect on the sentence he received. His sentence was statutorily required by his pleas of guilty.").

Our sister circuits that have considered the imposition of mandatory sentences in the wake of *Booker* have likewise held that *Booker* does not apply to statutory mandatory minimum sentences. *United States v. Duncan*, 413 F.3d 680, 683 (7th Cir. 2005); *United States v. Bermudez*, 407 F.3d 536, 545 (1st Cir. 2005); *United States v. Cardenas*, 405 F.3d 1046, 1048 (9th Cir. 2005); *United States v. Childs*, 403 F.3d 970, 972 (8th Cir. 2005); *United States v. Moore*, 401 F.3d 1220, 1222 n.1 (10th Cir. 2005); *United States v. Groce*, 398 F.3d 679, 682 n.2 (4th Cir. 2005); *United States v. Shelton*, 400 F.3d 1325, 1333 n.10 (11th Cir. 2005); *United States v. Sharpley*, 399 F.3d 123, 127 (2d Cir. 2005).

Because the district court sentenced Gonzalez to a mandatory sentence pursuant to 21 U.S.C. § 841(b)(1), we must conclude that no *Booker* error occurred.

VII.

For the reasons stated above, we affirm Gonzalez's conviction and sentence of life imprisonment.