RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 10a0237p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

—————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ERNEST B. CECIL,

*Defendant-Appellant.*

No. 08-5080

—————

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 06-00239—Aleta Arthur Trauger, District Judge.

Argued: January 12, 2010

Decided and Filed: August 10, 2010

Before: MARTIN, BOGGS, and WHITE, Circuit Judges.

—————————————

## COUNSEL

**ARGUED:** Kathleen G. Morris, LAW OFFICES, Nashville, Tennessee, for Appellant. Tritia Lindsay Yuen, DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Kathleen G. Morris, LAW OFFICES, Nashville, Tennessee, for Appellant. Teresa A. Wallbaum, DEPARTMENT OF JUSTICE, Washington, D.C. for Appellee.

—————————————

## OPINION

—————————————

BOGGS, Circuit Judge. Ernest Cecil, formerly an officer of the Metropolitan Nashville Police Department ("MNPD"), was convicted of one count of conspiracy to distribute, and to possess with intent to distribute, cocaine, in violation of 21 U.S.C. § 846; one count of aiding and abetting another to possess with intent to distribute 500 grams or more of cocaine, in violation of 18 U.S.C. § 2; one count of interference with commerce by robbery, in violation of 18 U.S.C. § 1951; and one count of brandishing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii). As a result,

1

he was sentenced to 144 months of imprisonment.  He now appeals his convictions and his sentence.

With respect to his convictions, Cecil makes three general arguments.  First, he argues that his convictions should be reversed because the district court erred in denying his *Batson* challenge to the government's peremptory strike of an African-American prospective juror.  Second, he argues that the district court abused its discretion with respect to a number of evidentiary rulings.  And, finally, he argues that the evidence was insufficient to convict him of any of the crimes with which he was charged.

As regards his sentence, he argues that, because the district court expressed a desire to sentence him below the mandatory minimum, his sentence was unreasonable.  He also implies that 18 U.S.C. § 3553(a) may provide a vehicle for circumventing mandatory minimum sentences.  Finally, he contends that congressionally imposed sentencing floors violate the separation-of-powers doctrine by encroaching on judicial discretion to fashion fundamentally just punishments.

For the following reasons, we affirm Cecil's convictions and sentence.

## I.  FACTUAL BACKGROUND

### A.  Procedural History

On December 21, 2006, a grand jury sitting in the Middle District of Tennessee returned a four-count indictment, charging Cecil with conspiracy to distribute and to possess with intent to distribute 5 kilograms of cocaine, in violation of 21 U.S.C. § 846 (Count One); possession with intent to distribute of 500 grams or more of cocaine, in violation of 21 U.S.C. § 841(a) (Count Two); interference with commerce and aiding and abetting interference with commerce by participating in a cocaine-related robbery, in violation of 18 U.S.C. §§ 1951 and 2 (Count Three); and using and carrying a firearm during and in relation to a crime of violence and a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Count Four).  On September 26, 2007, following a five-day trial, Cecil was convicted of Counts Three and Four.  He was also convicted of lesser included offenses on Counts One and Two.

Cecil was sentenced on January 4, 2008.  At sentencing, the district court indicated that, despite its desire to go lower, its "hands [we]re tied by Congress" and it consequently

"sentence[d] Mr. Cecil to the mandatory minimum on Counts One through Three, 60 months to run concurrent with each other, and to the minimum mandatory [sic] of 84 months consecutive on Count Four."

## B.  The Testimony at Trial

At trial, the government introduced the testimony of, among others, Corey Cecil (hereinafter "Corey"), a convicted drug dealer and the defendant's nephew, and Newman Hawkins, Corey's friend and one of his drug suppliers.  The following narrative is culled from their testimony.

In Spring 2003, shortly after he was released from prison, Corey approached Cecil, then an officer of the MNPD, with a plan.  The plan was to steal "large quantities of cocaine" from one of Corey's drug suppliers.  Cecil, who had once arrested Corey for dealing drugs, consented to the plan, stating, "[I]f you can pull it off, I'll assist you."  At the time, Cecil was apparently in need of "some extra money."

Corey's plan was simple.  Corey and his supplier would take separate cars to the point of exchange, whereupon Cecil, acting as a police officer, would intervene and detain the supplier.  This would give Corey an opportunity to drive off with the cocaine.  In order to make the intervention look real, Cecil was to "[u]se his police tactics, put his lights on, pull [the supplier over], that type of stuff [police] do when [people] get pulled over."  Once Cecil released the supplier, Corey would contact the supplier and indicate that, shortly after driving off, he too had been stopped by the police.  *See ibid.*  He would also state that the drugs had been seized.  That way, Corey could keep the drugs, sell them, and give Cecil a cut, all without paying the initial cost.  Basically, the idea was to make the whole scenario look like "[a] drug bust went bad."

In April 2003, Corey was presented with an opportunity to implement the plan. Corey's friend Newman Hawkins told him that he could obtain "large quantities of cocaine."[1]  Sensing his chance, Corey subsequently called Cecil and "let [him] know he

---

[1]Even though Corey and Hawkins were friends, Corey had no reservations about the prospect of robbing Hawkins because he "knew Newman was not paying for the drugs."

ha[d] to be ready." Corey also told Cecil that he wanted "a friend [*i.e.*, another officer] with him so it would look more realistic."

On April 30, 2003, Corey waited at his mother's house for Hawkins to arrive with the cocaine. Hawkins, who had been fronted 3.5 kilograms of cocaine by a man named Miguel Hernandez, showed up in a blue Yukon SUV. He found Corey outside the house, waiting in his sedan.

Emerging from the car, Corey approached the Yukon, prompting Hawkins to gesture to some cocaine in the vehicle. Corey then took the cocaine and placed it in his trunk, telling Hawkins that he would have to go someplace to get the money. Corey suggested that Hawkins follow him, but Hawkins explained that he was supposed to pick up his girlfriend at work. The men therefore decided that Corey would follow Hawkins, after which they would drive, independently, to the location of the money, a place called Vine Hill.

At that point, Corey and Hawkins set out in separate cars. Prior to their departure, Corey had called Cecil, who had parked nearby so as to follow the pair to the payment location. Thus, when Corey and Hawkins left, Cecil, who was accompanied by a partner, was able to fall in behind them. Once Hawkins arrived at his girlfriend's workplace, Cecil threw on his sirens. Corey immediately peeled off, leaving the scene. Hawkins, however, had no time to escape, and Cecil pulled in behind him.

Drawing their guns, Cecil and his partner, a fellow officer whom he had recruited per Corey's request, emerged from their vehicle. They told Hawkins to "cut [his] truck off, stick [his] hand out the window and open the door from the outside and get on the ground." The officers then handcuffed Hawkins and transported him and his vehicle to another location. Following a brief search of Hawkins's vehicle, the officers released him. When they did, Cecil gave Hawkins his business card and said, "[I]f [you're not] selling drugs don't start; if you're selling drugs, stop, sir."

After absconding with the cocaine, Corey eventually sold it for approximately $70,000. Of this amount, he gave his uncle only $10,000, deceiving Cecil into believing that Hawkins had only come through with one kilogram of cocaine.

## II. CECIL'S *BATSON* CHALLENGE

Cecil's first contention is that the district court erred in rejecting his *Batson* challenge to the government's peremptory strike of prospective juror Sherilynn Carter, an African-American.[2] He argues that the district court misapplied the controlling legal standard when ruling on his challenge by (1) denying the challenge before undertaking the third step of the tripartite *Batson* analysis and (2) failing to engage in a side-by-side comparison of Carter with jurors of different races whom the government did not exclude. He also argues that, if such a comparison is made, it is evident that the government's proffered race-neutral justification for excluding Carter was simply a pretext for racial discrimination.

"We review a district court's determination of a *Batson* challenge with 'great deference,' under a clearly erroneous standard." *United States v. Copeland*, 321 F.3d 582, 599 (6th Cir. 2003) (quoting *United States v. Buchanan*, 213 F.3d 302, 308-09 (6th Cir. 2000)); *see Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) ("On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous."). However, when ruling on alleged mistakes of law, the applicable standard of review is essentially *de novo*. *See United States v. Kimbrel*, 532 F.3d 461, 465-66 (6th Cir. 2008) ("Because this argument concerns an alleged mistake of law, it makes no difference whether we review this *Batson* challenge for clear error . . . or review it de novo. In either event, a mistake of law generally satisfies clear-error, de-novo or for that matter abuse-of-discretion review.").

"The Equal Protection Clause prohibits a party from using peremptory challenges to exclude members of the venire on account of their race." *United States v. Jackson*,

---

[2]The government actually exercised two peremptory strikes against African-Americans, one against Carter and one against Robert Tillman. At trial, Cecil raised *Batson* challenges to both strikes, but he now pursues only his challenge to the strike of Carter.

347 F.3d 598, 604 (6th Cir. 2003) (citing *Batson v. Kentucky*, 476 U.S. 79 (1986)). "In order to establish an equal protection violation under *Batson*, the complaining party must first make a *prima facie* showing that the peremptory challenge was based on race." *Ibid.* (citing *McCurdy v. Montgomery County*, 240 F.3d 512, 521 (6th Cir. 2001)). If the complaining party makes out a *prima facie* case, "the proponent of the strike . . . must proffer a facially valid, race-neutral explanation for the challenge." *Kimbrel*, 532 F.3d at 466. Assuming "the proponent has produced a facially valid explanation for the strike, the trial court must decide whether the opponent has proved purposeful discrimination." *Ibid.* "To do so, the court must 'assess the [proponent's] credibility under all of the pertinent circumstances, and then . . . weigh the asserted justification against the strength of the [opponent's] prima facie case under the totality of the circumstances.'" *Ibid.* (quoting *Paschal v. Flagstar Bank*, 295 F.3d 565, 574 (6th Cir. 2002)) (alterations in original). In the end, "the ultimate burden of persuasion always rests with the party challenging the strike." *Jackson*, 347 F.3d at 604 (citing *McCurdy*, 240 F.3d at 521).

Cecil argues that the district court failed to perform this three-part analysis properly because it prematurely rejected his challenge without engaging in the third step. He notes that, as soon as the government proffered its race-neutral explanation for striking Carter—which was that her husband was a high-ranking officer of the MNPD—the district court stated, "Based upon that information . . . the court is going to deny the defense *Batson* challenge to the panel." But, as the government's brief points out, this was not the end of the line. Cecil's counsel then requested an opportunity to be heard and voiced several reasons why the government's explanation was unsatisfactory. Once she was done, the district court denied the motion, explaining that, because of Carter's marriage, "there was some large potential for her either recognizing people [*i.e.*, officers] when they testif[ied] or recognizing people who [were] testified about or who were involved in some aspect of [the] case, [and for] her having some views about the police procedures that might [have] come in . . . ."

If the district court had actually truncated the *Batson* analysis by mechanically accepting the government's explanation for striking Carter, it would have erred. *See McCurdy*, 240 F.3d at 521-22 ("[W]e underscore that the district court's initial reaction to McCurdy's *Batson* claim, in which it perfunctorily accepted the County's race-neutral explanation, . . . did not conform to the requirement that the district court make expressed findings on each of the elements of a *Batson* claim."). But the district court did not stop short; the required analysis was ultimately carried out. Though it initially appeared to accept the government's proffered race-neutral justification at face value, the district court then heard additional argument and made its own findings with respect to the plausibility of the government's explanation. Under this court's holding in *McCurdy*, that is enough to overcome any fleeting failure to execute the third step of the analysis.[3] *See id.* at 522 ("Given that we grant 'great deference' to the district court's *Batson* findings, . . . and that the court ultimately engaged in the constitutionally required analysis, we affirm the district court's analysis." (internal citations omitted)).

In addition to asserting that the third step was bypassed, Cecil argues that it was misapplied, claiming that the district court failed to engage in comparative juror analysis. The major premise of his argument is that, when determining whether the government has exercised a peremptory strike in a purposefully discriminatory manner, the district court is under an affirmative obligation to compare the excluded juror with those whom the government did *not* exclude to see if the only relevant distinguishing factor is race. This obligation, he contends, arises even if the parties themselves do not request such a juxtaposition of the jurors. As support for his position, Cecil points to our decision in *United States v. Torres-Ramos*, in which we stated that there is "an affirmative duty on

---

[3]We acknowledge, however, that the manner in which the *Batson* analysis was performed in this case was somewhat less than ideal. In particular, we are concerned by the fact that the district court repeatedly voiced its intention to deny Cecil's *Batson* challenge before his attorney was able to address the relevant issues. Given the district court's premature indication that the challenge would be denied, there could have been an impression that the outcome of the challenge was something of a foregone conclusion, an impression augmented by the fact that, prior to conducting the analysis, the district court dismissed the prospective jurors as to whom the government had exercised the disputed peremptory strikes. *Batson* challenges are an important tool for ferreting out invidious discrimination, and, as such, they should not be glossed over with undue haste. Thus, when conducting the three-step *Batson* analysis, a court should take care to delineate each of the steps explicitly, reserving judgment on the challenge until all of the steps have been performed. Furthermore, at the third step of the *Batson* framework, a court should take the time to articulate thoroughly its findings on the issue of purposeful discrimination.

the [part of the] district court to examine relevant evidence that is easily available to a trial judge before ruling on a *Batson* challenge." 536 F.3d 542, 560 (6th Cir. 2008).

But *Torres-Ramos* is not entirely on point. There, we were faced with a situation in which the district court attempted to engage in comparative juror analysis but misapprehended the standard, juxtaposing the excluded jurors with other excluded jurors. With respect to that error, we observed that "[t]he district court should not have allowed the prosecution to exclude an African-American merely because that panelist resembled some other excluded panelist; rather the district court's duty was to compare the excluded potential juror to other persons who were *not* excluded by the prosecution." *Ibid.* In light of this language, we read *Torres-Ramos* to stand for the simple premise that, when a district court conducts comparative juror analysis, it is under an obligation to get it right. If neither party argues for such analysis to prove or disprove purposeful discrimination, the district court's failure to undertake it is not necessarily reversible error.

In this case, we are of the opinion that, had comparative juror analysis been undertaken, no clear indication of purposeful discrimination would have been uncovered. When questioned as to why the government struck Sherilynn Carter, the government's lawyer responded that it was because "her husband was a [high-ranking] officer in the Metro Nashville Police Department." None of the remaining jurors was tied this intimately to the MNPD.

Cecil argues, however, that there was at least one white juror who was similarly situated.[4] Specifically, he points to Barbara Sweatt, who indicated during voir dire that she had a good friend who served as an officer in Nashville. But as Sweatt conceded, her friend was "a brand new police officer." By contrast, Carter's husband was a long-serving captain. Thus, as the district court observed, it is plain that Carter was likely to

---

[4]In all, he argues that there were three, but, as he concedes, two of them were struck by the defense. However, even if we assume that they should still be compared with Carter, they are nonetheless differently situated. One, Settles, had a father who served in the MNPD, but his father retired in "'62," making it highly unlikely that Settles would be familiar with current MNPD personnel and protocol. The other, McJilton, was simply an army prosecutor, which in no way ties him to the MNPD.

"bring[] some knowledge or some perception of [the] department and of the police officers in general in a more personal way than anyone else in the panel."

Cecil contends that the government's proffered rationale was nonetheless pretextual and that this is apparent if Carter's voir dire testimony is contrasted with Sweatt's. Whereas Carter indicated that her husband was taciturn with respect to his job ("He doesn't discuss work. He has enough work at work."), Sweatt stated that her friend was relatively loquacious ("Q: You don't talk about his work all that much or do you talk about his work? A: We do. It's interesting."). Cecil contends that, in light of these discrepancies, Sweatt was, if anything, more likely to know about the people and policies of the MNPD.

We reject this argument. Regardless of how terse Carter's husband was, it is easy to infer that he was significantly more familiar with the department than was Sweatt's newly hired friend. The potential for some of that knowledge to have rubbed off on Carter is obvious. We therefore agree with the district court's determination that Cecil failed to meet his burden of demonstrating purposeful discrimination on the part of the government.

## III.  THE DISTRICT COURT'S EVIDENTIARY RULINGS

Cecil also asserts that the district court bungled several evidentiary rulings. Specifically, he challenges the district court's decisions to (A) admit records of his and his wife's respective bank accounts, (B) admit summary charts of those records, and (C) exclude a report prepared by Officer James McWright. A district court's evidentiary rulings are reviewed for abuse of discretion. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997); *United States v. Blackwell*, 459 F.3d 739, 752 (6th Cir. 2006). "In reviewing a trial court's evidentiary determinations, this court reviews *de novo* the court's conclusions of law and reviews for clear error the court's factual determinations that underpin its legal conclusions." *United States v. Salgado*, 250 F.3d 438, 451 (6th Cir. 2001).

**A. The Bank Records**

During Cecil's trial, Corey testified that, following the robbery of Newman Hawkins on April 30, 2003, he gave Cecil $10,000. To corroborate this assertion, the government introduced bank records showing the cash deposit activity in Cecil and his wife's bank accounts over the period from 2002 to 2004. The records indicated that, in 2002, Cecil and his wife made only four deposits totaling $3,830. The records also indicated that, in 2004, Cecil and his wife again made only four deposits worth, in aggregate, $1,610. But, according to the records, the deposit activity in 2003 was atypical. Over the course of the year, Cecil and his wife deposited $10,706 in cash, most of which was deposited on May 5 and 6, 2003. More specifically, the records showed that, over those two days, Cecil made a pair of relatively large cash deposits, putting a sum of $4,000 into his account at Regions Bank. Additionally, the records disclosed that, on May 5, 2003, Cecil's wife deposited $2,000 into her account at Bank of America. The records thus revealed that $6,000, an amount much greater than Cecil's customary annual total, had been deposited in his and his wife's bank accounts on consecutive days within a week of the date on which he stopped Newman Hawkins.

Cecil argues that the admission of these records was an abuse of discretion, as the records were irrelevant and therefore inadmissible under Federal Rule of Evidence 402.[5] To establish this proposition, he cites the Supreme Court's decision in *Williams v. United States*, which held that deposits in the bank accounts of a defendant and his wife were irrelevant because "there was no necessary connection between the deposits and the specific charges against the defendant." 168 U.S. 382, 396 (1897).

But the facts of *Williams* are clearly distinguishable from the facts of the present case. In *Williams*, the defendant was charged with extorting $185. *See ibid.* As proof, the government introduced evidence that, for several months, he had been depositing hundreds of dollars in both his and his wife's bank accounts. *See id.* at 395. In addition to information about the defendant's relatively modest salary, the deposit history was the

---

[5]Rule 402 indicates that "[e]vidence which is not relevant is not admissible."

only evidence offered, and the government made no attempt to link the deposits to the allegedly extorted sum. *See id.* at 392 ("It is stated in the bill of exceptions that, independent of that affidavit, there was no evidence whatever before the court relative to the matters therein referred to except certain bank books offered and read in evidence over the objections of the accused."). By contrast, the evidence adduced in the present case does not require so vast an inferential leap; here, the sums deposited in Cecil and his wife's bank accounts were linked to the particular offense through (a) Corey's testimony that he gave Cecil $10,000 and (b) the chronological proximity of the deposits to the alleged robbery. Given these factual disparities, *Williams* is inapposite.

Furthermore, following *Williams*, "[w]e have consistently held that sudden unexplained wealth occurring after the commission of an offense is admissible evidence." *United States v. Ingrao*, 844 F.2d 314, 316 (6th Cir. 1988); *see United States v. O'Neal*, 496 F.2d 368, 370-71 (6th Cir. 1974) ("This court has repeatedly held that it is permissible for the prosecution to show unusual wealth in the hands of a previously impecunious defendant immediately subsequent to the happening of a theft of money."); *see also United States v. Amerine*, 411 F.2d 1130, 1132 (6th Cir. 1969) ("There was, in our opinion, evidence in this case from which the jury could have inferred a 'natural connection' between the missing $36,000 and the funds appellant spent immediately after December 14, 1965."). Consequently, we reject Cecil's argument that the bank records were irrelevant and therefore inadmissible.

## B.  The Summary Charts

Next, Cecil attacks the district court's admission of charts summarizing the aforementioned records, contending that their admission was improper under Federal Rule of Evidence 1006.[6] More precisely, he argues that, because the bank records were inadmissible, any summary charts based on them were also inadmissible. Admittedly, his argument's major premise is true: "Rule 1006 requires that the proponent of the

---

[6]Rule1006 provides: "The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court."

summary establish that the *underlying documents* are admissible in evidence." *Martin v. Funtime, Inc.*, 963 F.2d 110, 116 (6th Cir. 1992) (quoting *United States v. Johnson*, 594 F.2d 1253, 1256 (9th Cir. 1979)). But this victory is meaningless, as the bank records were, in fact, admissible. Consequently, Cecil has failed to demonstrate that the district court abused its discretion in admitting the summary charts.

## C. Officer McWright's Report

Cecil's final evidentiary argument is that the district court improperly excluded two versions of a report prepared by Officer James McWright, a member of the MNPD drug task force. The report, for which Cecil himself provided the information, indicated that he had stopped Newman Hawkins's vehicle and that Hawkins was distributing cocaine. When the defense attempted to admit the report into evidence, the district court deemed it inadmissible hearsay. Cecil argues that the report was a record of a regularly conducted business activity and should therefore have been excepted from exclusion under the hearsay rule. He is incorrect.

Federal Rule of Evidence 803 provides a list of exceptions to the hearsay rule, one of which is the so-called business-records exception. As this court explained in *Cobbins v. Tenn. Dep't of Transp.*,

> [a] business record is admissible under Rule 803(6) where a sufficient foundation for reliability is established. Business records are properly admitted under the business records exception to the hearsay rule if they satisfy four requirements: (1) they must have been made in the course of regularly conducted business activities; (2) they must have been kept in the regular course of business; (3) the regular practice of that business must have been to have made the memorandum; and (4) the memorandum must have been made by a person with knowledge of the transaction or from information transmitted by a person with knowledge.

566 F.3d 582, 588 (6th Cir. 2009). Additionally, if the record is based on the statements of an informant rather than the first-hand observations of its author, the informant must also be acting under a business duty. *See United States v. Yates*, 553 F.2d 518, 521 (6th Cir. 1977) ("The mere fact that the recordation of the third party statements is routine, taken apart from the source of the information recorded, imports no guaranty of the truth

of the statements themselves."); *see also United States v. Bortnovsky*, 879 F.2d 30, 34 (2d Cir. 1989) ("[A] statement does not satisfy the rule's requirements [if] there was no showing that [the speaker] had a duty to report the information he was quoted as having given."); *United States v. McIntyre*, 997 F.2d 687, 699 (10th Cir. 1993) ("The essential component of the business records exception is that each actor in the chain of information is under a business duty or compulsion to provide accurate information.").

In this case, the district court correctly concluded that, because Cecil did not demonstrate that he was under a duty to report to Officer McWright, there was a "break in the chain."  As the district court noted, Officer McWright was neither Cecil's supervisor nor even in the same section.  Furthermore, when asked, Officer McWright did not know why Cecil came to him with the information that was eventually placed in the report.  Consequently, the inference of reliability that comes from adherence to routine practice is absent, and the district court was well within its discretion when it concluded that Rule 803(6) was inapplicable.

### IV. THE SUFFICIENCY OF THE EVIDENCE

Cecil also argues that the evidence was insufficient to support his convictions.[7] "The standard of review for a sufficiency of the evidence challenge is 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Craft*, 495 F.3d 259, 263 (6th Cir. 2007) (quoting *United States v. Davis*, 473 F.3d 680, 681 (6th Cir. 2007)).  "Moreover, every reasonable inference from the evidence must be drawn in the government's favor." *United States v. Woods*, 877 F.2d 477, 479 (6th Cir. 1989) (citing *United States v. Cooperative Theatres of Ohio, Inc.*, 845 F.2d 1367, 1373 (6th Cir. 1988)).  "The evidence need not exclude every logical hypothesis other than guilt." *Ibid.* (citing *United States v. Green*, 548 F.2d 1261, 1266 (6th Cir. 1977)).

---

[7]We address the convictions in the order in which they are addressed in Cecil's brief.

## A.  The Hobbs Act (18 U.S.C. § 1951(a))

With respect to his conviction for interference with commerce, in violation of the Hobbs Act,[8] Cecil advances three contentions.  First, he argues that the Hobbs Act is designed to punish interference with *lawful* commerce, meaning any evidence showing that he interfered with *unlawful* commerce is insufficient to sustain his conviction.  Second, he claims that the government failed to show that the cocaine involved in the offense traveled in interstate commerce, which was required to satisfy the Act's jurisdictional nexus.  Finally, he asserts that the government failed to prove that he knowingly participated in the robbery of Newman Hawkins.  Each of these arguments fails.

The first is completely foreclosed as a matter of law.  In *United States v. Ostrander*, this court held in no uncertain terms that "illegal commerce counts as commerce for Hobbs Act purposes."  411 F.3d 684, 692 (6th Cir. 2005); *see United States v. McFarland*, 311 F.3d 376, 401 (5th Cir. 2002) (en banc) (observing that the Hobbs Act has "been held to apply to robbery (or extortion) which adversely affects *ill*egal commerce").  Thus, Cecil cannot prevail on his claim that the illegality of the commerce defeats his conviction.

Next, Cecil argues that "the government failed to prove beyond a reasonable doubt that the cocaine traveled in interstate commerce, an element of the Hobbs Act."[9] Appellant's Br. at 28.  Assuming, *arguendo*, that the government is indeed required to show that the drugs moved across state lines, it has done so.  At trial, Miguel Hernandez, Newman Hawkins's drug supplier, testified that his cocaine was provided by an individual named Andreas Miranda.  When asked where Miranda's cocaine came from,

---

[8]The Hobbs Act punishes anyone who "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section . . . ." 18 U.S.C. § 1951(a).

[9]The Hobbs Act does not actually require a showing that certain goods traveled in interstate commerce.  Rather, "the Government must prove . . . interference with interstate commerce . . . ." *Ostrander*, 411 F.3d at 691.  This element is referred to as the "jurisdictional nexus." *Ibid.* (quoting *United States v. Wang*, 222 F.3d 234, 239-40 (6th Cir. 2000)).

Hernandez replied, "I believe he was getting it from Atlanta."[10]  There is thus evidence in the record from which a reasonable juror could conclude that the cocaine traveled from Georgia to Tennessee, and Cecil's argument that the Hobbs Act's jurisdictional nexus went unfulfilled must therefore be rejected.

Finally, Cecil argues that the government simply failed to prove that he was a participant in the robbery, suggesting that Corey's testimony that his uncle was a knowing participant was not credible in light of other evidence.  A portion of this other evidence was Hawkins's testimony to the effect that Cecil gave him a business card after detaining him and told him not to sell drugs.  Cecil argues that, if he had actually robbed Hawkins, he would not have acted in such a "purely professional manner."  Appellant's Br. at 29.

But this behavior appears to be entirely consistent with the plan Corey and Cecil allegedly concocted.  Corey testified that he wanted Cecil to "[u]se his police tactics, put his lights on, pull [the victim] over, that type of stuff they do when you get pulled over." In light of this testimony, the transfer of the business card and the words of advice could reasonably be seen as a part of the ruse; Cecil, one could conclude, was simply playing the role of the police officer with fidelity.

 Cecil also seizes on the fact that Hawkins's story does not completely agree with Hernandez's, arguing that it is therefore more rational to conclude that Hawkins and Corey were in fact conspiring to steal the cocaine from Hernandez.  At trial, Hawkins testified that, following the robbery, he met with Hernandez and told him that he didn't know what happened to the cocaine.  Hernandez, on the other hand, testified that Hawkins said the drugs had been seized by the police.  From this discrepancy, Cecil argues, any rational juror would have to conclude that Hawkins and Corey were in fact responsible for purloining the cocaine.

---

[10]From Hernandez's use of the term "believe," Cecil infers that he was speculating as to the cocaine's point of origin.  However, it is equally, if not more, plausible that Hernandez was simply saying "I believe" to mean "I understand," as many people do.  Given our obligation to draw all reasonable inferences in favor of the government, we decline Cecil's invitation to disregard Hernandez's testimony.

In rebuttal, it must first be observed that, in addition to Corey's testimony that Cecil was his partner, the government introduced evidence showing that Cecil came into a significant quantity of cash during the week following the robbery, a piece of evidence weighing strongly in favor of Cecil's involvement.  Furthermore, discrepancies in the testimony are for the jurors to sort out.  *See Tibbs v. Florida*, 457 U.S. 31, 45 n.21 (1982) ("The trier of fact, not the appellate court, holds 'the responsibility . . . fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979))). Without more, we cannot say that no reasonable juror could have concluded that Cecil was a knowing participant in the robbery.

**B.  Use of a Firearm (18 U.S.C. § 924(c)(1))**

Cecil also suggests that the evidence was inadequate to support his conviction for possessing a firearm during and in relation to a crime of violence and a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1).  To make out a violation of § 924(c)(1), the government must prove beyond a reasonable doubt that the defendant "(i) carried or used a firearm; (ii) during and in relation to a drug trafficking crime." *United States v. Warrick*, 167 F.3d 965, 971 (6th Cir. 1999).  Cecil argues that the government failed to satisfy this burden, suggesting that, even if he were involved in the robbery, he did not use his weapon until after the crime was complete.  He further suggests that, because the firearm served a peripheral purpose in the activity, he did not use it to facilitate the robbery.  Neither of these arguments prevails.

His first argument is premised on the notion that, because he did not draw his gun on Hawkins until after the robbery was complete, he did not use a firearm *during* the robbery.  It is clear, however, that when Cecil brandished his gun to detain Hawkins, the robbery was still in progress.

As we have noted, albeit with respect to a somewhat different offense, "the crime of bank robbery cannot be completed without some form of flight or attempted flight . . . [and] is [therefore] more naturally understood to include the act of fleeing and the immediate consequences of such flight." *United States v. Muhammed*, 948 F.2d 1449,

1456 (6th Cir. 1991) (interpreting the meaning of the term "victim" as it is used in USSG §2B3.1(b)(3)). Accordingly, a number of courts have held that, in the context of § 924(c), a bank robbery does not necessarily end at the point along the time line at which all of the elements of the offense have been established. *See, e.g., United States v. Williams*, 344 F.3d 365, 374 (3d Cir. 2003) ("We view a reasonable reading of 'during and in relation to' a crime of violence as requiring a common sense, temporal approach to the specific facts, rather than a categorical approach. Therefore, we decline to look only at the offense under § 2113(a) to determine whether Williams carried the gun 'during' the crime."); *United States v. Pate*, 932 F.2d 736, 738 (8th Cir. 1991) ("The escape phase of a crime is not . . . an event occurring 'after the robbery.' It is part of the robbery."). That premise led, in turn, to the conclusion that "flight may be considered a part of a bank robbery under § 924(c) . . . ." *Williams*, 344 F.3d at 375.

Applying this principle to the instant case, the evidence, if believed, clearly demonstrates that Cecil both carried and used his firearm "during" the robbery. Though Corey had already received the cocaine at the time Cecil drew his gun, Corey had not yet absolved himself of the duty to pay for the drugs. Cecil's armed intervention accomplished this aim by allowing Corey to escape with the plundered narcotics. Because Corey's flight was not complete when Cecil brandished his firearm, the evidence shows that the robbery was ongoing.

In addition to arguing that he used his firearm after the robbery was complete, Cecil argues that he did so in a way that did not "facilitate" the robbery. He notes that, under *United States v. Layne*, "to meet the 'during and in relation to' requirement, a firearm 'must have some purpose or effect with respect to the drug trafficking crime,' and 'at least must "facilitate, or have the potential of facilitating," the drug trafficking offense.'" 192 F.3d 556, 571 (6th Cir. 1999) (quoting *Smith v. United States*, 508 U.S. 223, 238 (1993)). He did not meet this facilitation requirement, he says, because, at the time he drew his gun, Hawkins's car was trapped, meaning Hawkins could not escape. Thus, according to Cecil, any function the gun had in preventing Hawkins from pursuing

Corey was redundant, and the use of the gun therefore did not facilitate the robbery. We find this argument wholly unconvincing.

In order to satisfy the "during and in relation to" requirement, Cecil's use of his firearm did not need actually to facilitate the robbery; it needed only to have had the *potential* for facilitating the robbery. Clearly, that is the case here. Cecil carried his firearm while following Hawkins to his girlfriend's place of employment. Surely, a rational factfinder could have found that, by carrying the gun, Cecil was furthering the ruse that he was acting as a police officer while stopping Hawkins. Alternatively, a reasonable juror could have concluded that Cecil was "embolden[ed]" by the presence of the firearm in his holster, "giving him the security and confidence to undertake the criminal act." *United States v. Brown*, 915 F.2d 219, 224 (6th Cir. 1990) (citing *United States v. Payero*, 888 F.2d 928, 929 (1st Cir. 1989)). Furthermore, it is also possible that, if Cecil had not eventually drawn his gun, Hawkins would have attempted to escape on foot, whereupon he might have caught up with Corey and demanded either payment for or return of the drugs. Thus, there was ample evidence that the firearm had some "purpose or effect" with regard to the theft of the cocaine. *Layne*, 192 F.3d at 571.

## C. Conspiracy to Distribute Cocaine (21 U.S.C. § 846)

Cecil also argues that there was insufficient evidence to convict him of conspiring to distribute cocaine, in violation of 21 U.S.C. § 846. "In order to show a conspiracy under § 846, the government must prove, beyond a reasonable doubt, '(1) an agreement to violate drug laws, (2) knowledge and intent to join the conspiracy, and (3) participation in the conspiracy.'" *United States v. Gibbs*, 182 F.3d 408, 420 (6th Cir. 1999) (quoting *United States v. Welch*, 97 F.3d 142, 148 (6th Cir. 1996)). Cecil argues that, if anything, he was an unknowing participant in a conspiracy between Corey and Hawkins. Ultimately, this argument proves unavailing.

To support it, Cecil simply points to the fact that he gave Hawkins a business card, arguing that this act indicates that his overall conduct was innocent. Again, however, the transfer of the card is entirely consistent with Corey's testimony that, to effectuate the robbery properly, he wanted his uncle to behave like a police officer.

Furthermore, it is not as though Corey's testimony stood alone. The government also proffered bank records indicating that Cecil made a number of large cash deposits in the days following the robbery. When viewed, as it must be, in the light most favorable to the prosecution, the evidence simply does not prevent a reasonable jury from determining beyond a reasonable doubt that Cecil had conspired with his nephew to distribute cocaine.

## D. Aiding and Abetting Possession of Cocaine (18 U.S.C. § 2)

Finally, Cecil contends that there was insufficient evidence to demonstrate that he aided and abetted Corey in possessing cocaine, with the intent to distribute, in violation of 18 U.S.C. § 2. "To prove that [a defendant] aided and abetted drug transactions under 18 U.S.C. § 2, the government must establish that [he] participated in the venture as something he wished to bring about and sought to make succeed." *United States v. Ward*, 190 F.3d 483, 487 (6th Cir. 1999). Cecil argues that he could not have aided and abetted Corey in possessing the cocaine because Corey had already obtained it before Cecil stopped Hawkins. This argument lacks merit.

We have recognized that one may aid and abet a drug offense even *after* the principal has relinquished control of the drugs. *See United States v. Ledezma*, 26 F.3d 636, 643 (6th Cir. 1994) ("We recognize that aiding and abetting a drug offense may encompass activities, intended to ensure the success of the underlying crime, that take place after the delivery and after the principal no longer possesses the narcotics."). In this case, even though Corey already possessed the narcotics when Cecil arrived, Cecil's act was clearly intended to help Corey retain the drugs, as the evidence indicates that, but for Cecil's intervention, Corey would have been expected to pay. Therefore, the evidence was sufficient to establish the elements of aiding and abetting the (continued) possession.

## V.  CECIL'S SENTENCE

When imposing Cecil's sentence, the district court lamented its inability to select anything less than the "draconian" and "inappropriate" mandatory minimums. Latching onto these statements, Cecil argues that his sentence was unreasonable.  He also contends that, in light of 18 U.S.C. § 3553(a)'s command to district courts to impose a sentence no greater than necessary to serve the purposes of sentencing, district courts should have the power to disregard statutorily mandated minimum sentences. Additionally, he claims that such sentences violate the separation-of-powers doctrine by depriving courts of their inherent discretion to impose fundamentally just sentences.  He is wrong on all counts.

Preliminarily, we note that a district court's ardent desire to go lower does not make a statutory mandatory minimum sentence unreasonable.  *See United States v. Gonzalez*, 257 F. App'x 932, 947 (6th Cir. 2007) ("Because Gonzalez was sentenced to a mandatory sentence . . . we must reject Gonzalez's reasonableness claim."); *see also United States v. Caballero*, 256 F. App'x 881, 882 (6th Cir. 2007) ("Caballero's sentence is not unreasonable because in these circumstances the district court did not have discretion to impose a sentence below the mandatory minimum sentence.").  When a court and a mandatory minimum are in conflict, the minimum wins.[11]

Furthermore, contrary to Cecil's suggestion, a district court's wish to impose a sentence beneath the mandatory minimum cannot be effectuated through resort to § 3553(a).  When it comes to rigid minimum sentences, "[w]e acknowledge the tension with section 3553(a), but that very general statute cannot be understood to authorize courts to sentence below minimums specifically prescribed by Congress." *United States v. Franklin*, 499 F.3d 578, 585-86 (6th Cir. 2007) (quoting *United States v. Roberson*, 474 F.3d 431, 436 (7th Cir. 2007)); *see United States v. Castaing-Sosa*, 530 F.3d 1358, 1361 (11th Cir. 2008) ("Reading § 3553 as a whole, § 3553(a) plainly does not confer

---

[11]This statement should not be taken to insinuate any error on the part of the district court in this case.  It appropriately did what it had to do, recognizing that its "hands [we]re tied by the Congress in this instance."

upon the district court the authority to sentence a defendant below the statutory mandatory minimum based on its consideration of the § 3553(a) factors."); *United States v. James*, 487 F.3d 518, 530 (7th Cir. 2007) ("*Booker* does not license district courts to employ § 3353 [sic] to disregard statutory mandatory minimum sentences.").

Finally, the separation-of-powers doctrine provides no comfort for those seeking additional judicial discretion in the sentencing context.  As the Supreme Court observed in *Mistretta v. United States*, Congress has the power to fix the sentence for a federal crime.  488 U.S. 361, 364 (1989).  Thus, "the scope of judicial discretion with respect to a sentence is subject to congressional control."  *Ibid.*; *see Chapman v. United States*, 500 U.S. 453, 467 (1991) ("Congress has the power to define criminal punishments without giving the courts any sentencing discretion.").  With this circumstance in mind, we have "flatly rejected" the claim that mandatory minimums unconstitutionally violate separation-of-powers principles.  *United States v. Odeneal*, 517 F.3d 406, 414 (6th Cir. 2008).  So have other circuit courts.  *See, e.g, United States v. MacEwan*, 445 F.3d 237, 252 (3d Cir. 2006) ("[W]e cannot agree that the use of mandatory minimums violates the doctrine of separation of powers."); *United States v. Holmes*, 838 F.2d 1175, 1178 (11th Cir. 1988) ("[The] argument that the mandatory minimum sentence requirements violate the separation of powers doctrine is without force.").

## VI.  CONCLUSION

For the foregoing reasons, we **AFFIRM** Cecil's convictions and sentence.