NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0699n.06

No. 11-6412

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
*Jul 30, 2013*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| ADAM M. MILLER, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF TENNESSEE |
| Defendant-Appellant. | ) | |

Before:      KEITH, CLAY, and KETHLEDGE, Circuit Judges.

**DAMON J. KEITH, Circuit Judge**.  Defendant appeals his conviction by jury for aiding and abetting possession with intent to distribute oxycodone, in violation of 21 U.S.C. § 841, and conspiring to commit promotional money laundering, in violation of 18 U.S.C. §1956.  He argues that the evidence was insufficient to support either charge, that the indictment was constructively amended to reflect concealment money laundering instead of promotional money laundering, and that the prosecutor committed misconduct by eliciting overview testimony and testimony about his criminal record.

Defendant also appeals his 168-month sentence, arguing that it is substantively unreasonable. He contends that the district court impermissibly considered his decision to go to trial and put too much weight on the factors of deterrence and the impact of drug trafficking on the local community when it calculated Defendant's sentence.

For the reasons that follow, we affirm Defendant's convictions and sentence.

*Sufficiency of the Evidence*

On appeal, Defendant argues that the evidence was insufficient to convict him of aiding and abetting possession with intent to distribute oxycodone and conspiring to commit promotional money laundering. We review a challenge to the sufficiency of the evidence by examining the evidence in the light most favorable to the Government and drawing all inferences in the Government's favor in order to determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *United States v. Cecil*, 615 F.3d 678, 691 (6th Cir. 2010). Because the record contained sufficient evidence for a rational trier of fact to convict Defendant of aiding and abetting possession with intent to distribute oxycodone and conspiring to commit promotional money laundering, we affirm.

Defendant was indicted as part of a thirty-six member conspiracy to transport oxycodone from Florida for distribution in Tennessee from 2007 until 2009. Nicholas Raffa was the leader of the drug distribution ring and pleaded guilty to several charges stemming from the conspiracy. Raffa and several other cooperating co-conspirators—including Joseph Lees, Dustin Royle, Justin Murabito, and Pepper Dawson—testified for the Government at Defendant's trial.

The co-conspirators stored money and pills in a safe in a residence on Triangle Road in Johnson City, Tennessee. After Defendant witnessed co-conspirators Lees and Patrick Jannett get arrested, he alerted Raffa about the arrests. As a result, Raffa flew to Tennessee to recover the safe. Subsequently, Raffa and several other co-conspirators broke open the safe and recovered the contents. After their arrests, Lees and Jannett agreed to cooperate with authorities.

At trial, Lees testified that he told investigators that his girlfriend, Delilah Jimenez, had delivered pills to a residence on Triangle Road in Johnson City. Lees participated in four recorded phone calls on August 31, 2007. In the first call—after Defendant had witnessed Lees get arrested—Defendant called Lees's girlfriend to "make sure everything was okay." During the call Jimenez gave the phone to Lees. Lees asked Defendant if he had spoken to Raffa. Defendant offered to put Dustin Royle on the phone, stating that Royle had been with Raffa that day. Lees informed Defendant that someone had gone into his house. Defendant replied that it was "to get [Lees's] safe."

During the second call, Lees asked Defendant where he could pick up his "shit." Defendant directed Lees to call a woman named Whitney and gave Lees a phone number. During the fourth recorded call, Lees stated he was about to meet Whitney to retrieve the pills from the safe, but that he needed to "get in touch" with Raffa because Lees did not have the keys to the safe. Defendant replied that other co-conspirators had already broken the safe open and thrown it away and saved the pills. Defendant asked Lees to leave some pills with Whitney for Defendant.

At trial cooperating co-conspirator Pepper Dawson also testified for the Government. She testified that she drove Defendant to deposit or wire drug proceeds two or three times. Moneygram and Western Union documentation in the record showed that someone named "Adam Miller" sent $16,240 over eight transactions to Silas Nelson and Arnoldo Compean between July 10, 2008 and August 14, 2008; Nelson and Compean were high level members of the conspiracy. Murabito also testified that after purchasing pills from Defendant on one occasion, Defendant hired him to wire $1,500 to Compean so that Defendant could "obtain more pills."

On appeal, Defendant argues that his recorded telephone conversations with Lees were insufficient to show that he aided and abetted Raffa's retrieval of oxycodone from Lees's safe. However, that argument artificially narrows the evidence that supports Defendant's conviction for aiding and abetting possession of oxycodone with intent to distribute.

To prove that Defendant aided and abetted a criminal offense, the Government must show (1) an act by Defendant that contributes to the execution of the crime and (2) the intent to aid in the crime's commission. *United States v. Bronzino*, 598 F.3d 276, 279 (6th Cir. 2010). Defendant does not dispute that he and Raffa were part of a conspiracy to both distribute oxycodone and possess oxycodone with the intent to distribute it. Defendant only disputes that he aided and abetted possession with intent to distribute oxycodone.

Defendant's recorded phone calls with Lees were not the only evidence that Defendant aided and abetted possession of oxycodone with intent to distribute. Raffa testified that he flew to Tennessee to retrieve about 1,000 oxycodone pills from the safe because of Defendant's alert that co-conspirators Jannett and Lees had been arrested. Defendant does not dispute that he knew that Raffa was part of a conspiracy to distribute oxycodone. Given that knowledge, on the basis of the above evidence, a rational trier of fact could find that Defendant aided and abetted possession with intent to distribute oxycodone by finding that he (1) contributed to Raffa's possession of oxycodone with (2) the intent to aid his distribution by alerting Raffa about Jannett and Lees's arrests.

On appeal, Defendant also argues that the evidence was insufficient to prove that Defendant conspired to commit promotional money laundering with the specific intent to promote Raffa's oxycodone operation. Instead, Defendant argues that his true animating purpose was to obtain

oxycodone for his own personal use, not promote the conspiracy. While we recognize that Defendant has a substance abuse problem and commend his demonstrated efforts toward recovery, the evidence in this case was sufficient to support his conviction for conspiracy to commit promotional money laundering.

To prove that Defendant conspired, the Government only needs to show "a tacit or material understanding among the parties." *United States v. Deitz*, 577 F.3d 672, 677 (6th Cir. 2009). Direct evidence is not necessary; the Government only needs to prove that he was "a party to the general conspiratorial agreement." *United States v. Christian*, 786 F.2d 203, 211 (6th Cir. 1986). To show that Defendant committed promotional money laundering, the Government must prove that Defendant (1) conducted a financial transaction with the proceeds of unlawful activity; (2) knew the property involved was proceeds of unlawful activity; and (3) intended to promote that unlawful activity. *United States v. Warshak*, 631 F.3d 266, 317 (6th Cir. 2010). Defendant only disputes that he intended to promote the unlawful activity—oxycodone distribution—when he wired money.

The evidence indicates—and Defendant does not dispute—that he was sending large sums of money to upper level co-conspirators in Florida, receiving large amounts of pills in return, and distributing at least some of those pills. On the basis of that concession alone, a rational trier of fact could find that Defendant had the specific intent to promote Raffa's oxycodone operation. However, there was additional evidence at trial of Defendant's intent to promote oxycodone distribution: Murabito testified that Defendant hired him to wire drug proceeds to "obtain more pills."

*Constructive Amendment of the Indictment*

Defendant argues that his Fifth Amendment right to be tried only for an indicted crime was violated because the indictment was constructively amended. Defendant argues that count three of the indictment was constructively amended from promotional money laundering to concealment money laundering by references to the concealment variety of money-laundering during the Government's opening statement and Department of Justice financial investigator Agent Karl Oroz's trial testimony. The specific statements by the Government and Agent Oroz are discussed in the analysis below.

We review *de novo* whether an indictment was constructively amended. *United States v. Smith*, 320 F.3d 647, 656 (6th Cir. 2003). A constructive amendment happens "when the terms of the indictment are in effect altered by the presentation of *evidence and jury instructions* which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in this indictment." *United States v. Solorio*, 337 F.3d 580, 590 (6th Cir. 2003) (emphasis added).

First, Defendant complains of the Government's opening statement that the money laundering count involved "the placing of funds into a financial transaction so that once they travel through a bank or some other financial transaction the funds look clean on the other side." However, opening statements do not constitute evidence. Further, the district court specifically instructed the jury that statements by counsel are not evidence. In this case, the district court gave an instruction that protected against—instead of aggravated—the statement about which Defendant complains. We cannot say that there was a substantial likelihood that the jury convicted Defendant of

concealment money laundering instead of promotional money laundering on the basis of one statement by counsel on the first day of trial during a three-day trial followed by a curative instruction.

Second, Defendant complains of Agent Oroz's definition of money laundering that included financial transactions designed to "promote the unlawful activity" or "to disguise or conceal" the nature of the proceeds. Oroz's statements about which Defendant complains were part of Oroz's initial general explanation of what constitutes money laundering. Later in his testimony that pertained to the instant case, Oroz stated, "what was indicted here was the promotion of unlawful activity, not the attempt to conceal." Because Oroz specifically testified that the indictment only included promotional money laundering and did not include concealment money laundering, we cannot say that there was a substantial likelihood that the jury convicted Defendant of concealment money laundering instead of promotional money laundering.

*Prosecutorial Misconduct: Agent Oroz and Officer Commons*

Financial investigator Agent Karl Oroz previously was a special agent with the IRS for twenty-five years. At trial, Agent Oroz's testimony included the following exchanges:

> Q. Okay. Now you've heard testimony, you've been sitting in the Trial yesterday and today, correct?
> A. Yes, I have.
> Q. And you've heard testimony about these wire transfers, correct?
> A. Correct.
> Q. Based on that testimony, in your experience what do these wire transfers represent?
> A. They're proceeds from the pill distribution here in Tennessee that was going down to Florida, and either Silas Nelson or Arnoldo Compean would eventually get that money to Nick Raffa, or a percentage of that.
> * * *

> Q.     Now, you also heard testimony of Mr. Miller's personal involvement in transporting and selling pills, correct?
> A.     Yes.
> Q.     Do you have an opinion as to his knowledge as to where this money might have come from?
> A.     I believe he had to know whether it came from the sale and distribution of the Oxycodone pills.

Drug Enforcement Agency Task Force Officer Mike Commons participated in investigating this conspiracy since 2007.  At trial, Officer Commons's testimony included the following exchanges:

> Q.     Now, you've discussed some of the players in this case, and the different types of players in a drug Conspiracy . Based upon your experience with this case, and your investigation, where did Adam Miller fit into that? What type of player was he?
> A.     He was, like a lot of these people, he was in and out. At the beginning he handled the meetings, he was the original person that Nick Raffa was up here to meet to start selling pills. When Nick first brought up the 80 milligram OxyContin to sell. So he handled distribution at that point. Then, as I said, when Patrick Jannett got in trouble Adam Miller kind of faded out, because he owed Nick Raffa money.  Raffa needed the money, he stopped trusting him, therefore he didn't use him any more. Towards the end he had to build that trust back up, and through Paul Seifert, Paul convinced Nick Raffa,"Hey, let him start doing some of the transporting, and it will show that the transport is good. Instead of paying him it will help offset what he owes you," and then Paul would take care of him, and then further on then Adam would start selling. Paul would give him pills, and he would take care of selling them, or distributing for Paul, or delivering for Paul.

Defendant argues that the Government committed prosecutorial misconduct by eliciting overview and opinion testimony from Agent Oroz and Officer Commons regarding the ultimate issue of his guilt.

Defendant did not object to Oroz's or Commons's testimony in the district court; therefore,

we review for whether a plain error affected Defendant's substantial rights. *United States v.*

*McAuliffe*, 490 F.3d 526, 530–31 (6th Cir. 2007).

Assuming *arguendo* that it was plain error to admit any of the testimony about which

Defendant complains, we cannot say that Defendant's substantial rights were affected. The evidence

of Defendant's guilt was overwhelming in this case. Given the strength of the evidence against

Defendant, his substantial rights would not have been affected by the erroneous admission of

overview opinion testimony.

*Prosecutorial Misconduct: Chelsea Lewis*

At trial, Defendant's ex-girlfriend, Chelsea Lewis, testified. On appeal, Defendant complains

about the following exchange:

> Q.     Okay, and how did you separate from Mr. Miller?
> A.     Well, we, I called the cops on him for a Domestic Assault. One of
> my, it was, he didn't actually beat me up or anything, but he was just really
> intoxicated, and came in, and we got in a fight, and then he said he was
> leaving and I was going to just lock the door and let him go, but he wanted
> back in, and then started punching the windows out, and blood was
> everywhere, and I just freaked out and called the cops, and they arrested him
> because he had kicked me, and they actually took a picture of where he had
> kicked me. They said it was Domestic Assault and took him to jail, and I
> went home with my parents at that point, and didn't. . .
> [Defense Counsel]: Objection . . .

At trial, Defendant objected to this line of questioning. The district court summarily overruled the

objection, agreeing with the Government that the testimony was relevant to the time line of the case.

On appeal, Defendant argues that the Government committed prosecutorial misconduct for eliciting testimony from Chelsea Lewis regarding a domestic assault charge she filed against Defendant because that charge was unrelated to the conspiracy charge.

We review the district court's decision to admit the testimony for an abuse of discretion where a party objected to the testimony at trial. *Trepel v. Roadway Express, Inc.*, 194 F.3d 708, 716 (6th Cir. 1999). Prosecutorial misconduct occurs where *the government makes improper statements* and the improper statements were flagrant and warrant reversal. *United States v. Crayton*, 357 F.3d 560, 572 (6th Cir. 2004).

The only question that the Government asked Lewis before she began describing the domestic assault was, "How did you separate from Mr. Miller?" Lewis's response about the domestic assault was unprompted by the Government. We cannot say that the Government made an improper statement or committed misconduct by asking Lewis how she separated from Defendant.

*Reasonableness of Sentence*

At sentencing, the district court granted Defendant's request for a two-level mitigating role reduction. The district court found that Defendant's guideline range was 168 to 210 months, based on an offense level of 32 and criminal history category of IV. Defendant does not dispute that the district court properly calculated the Guidelines range applicable to him. After the district court calculated Defendant's applicable Guidelines range, it discussed the fact that investigators and the Government had spent two years pursuing thirty six arrests and convictions in this conspiracy. The district court stated that § 3553(a) required it to impose a sentence that was sufficient but not greater

than necessary to comply with that statute. The district court sentenced Defendant to the floor of the applicable Guidelines range—168 months.

On appeal, Defendant argues that his sentence is substantively unreasonable because the district court improperly put undue weight on his decision to go to trial, the need for general deterrence, and the impact of drug trafficking on the local community. Defendant also argues that, even if the three convictions remain undisturbed on appeal, he should receive a sentence between fifty-seven and seventy-one months to eliminate sentencing disparities with respect to his co-conspirators.

We review a district court's sentencing decision under a deferential abuse-of-discretion standard. *United States v. Lumbard*, 706 F.3d 716, 721 (6th Cir. 2013). A within-Guidelines sentence is presumptively reasonable. *United States v. Polihonki*, 543 F.3d 318, 322 (6th Cir. 2008).

The district court imposed on Defendant the lowest possible sentence in the advisory Guidelines range after discussing the resources that went into prosecuting this conspiracy, the need for general deterrence, and the impact of drug trafficking on the local community. Defendant cannot rebut the presumption that his sentence was reasonable merely by alleging that he should have received a sentence lower than the bottom end of his advisory range. *See United States v. Dexta*, 470 F.3d 612, 616 (6th Cir. 2006).

Defendant's sentencing disparity argument does not rebut the presumption that his sentence was reasonable because sentencing disparity concerns pertain to national disparities for similarly situated defendants, not disparities between co-defendants. *United States v. Conatser*, 514 F.3d 508, 521 (6th Cir. 2008) ("[T]he need to avoid unwarranted sentence disparities among defendants with

similar records who have been found guilty of similar conduct . . . concerns *national* disparities between defendants with similar criminal histories convicted of similar criminal conduct—not disparities between codefendants.").

Because the evidence was sufficient to convict Defendant, the indictment was not constructively amended, Defendant's substantial rights were not affected by any prosecutorial misconduct, and Defendant's sentence was reasonable, we **AFFIRM** Defendant's conviction and sentence.